933 A.2d 426

**McNeal BROCKINGTON**

v.

**Joyce GRIMSTEAD.**

**No. 58, Sept. Term, 2006.**

Court of Special Appeals of Maryland.

Sept. 7, 2007.

Reconsideration Denied Nov. 6, 2007.

---

328

Jessica L. Ellsworth, Washington, DC (Mark D. Gately, on brief), Baltimore, for appellant.

Andrew H. Baida (Benjamin Rosenberg, on brief), Baltimore, Gary A. Wais, on brief, Owings Mills, for appellee.

Panel DEBORAH S. EYLER, ADKINS and KRAUSER, JJ.

EYLER, DEBORAH S., J.

In the Circuit Court for Baltimore City, Joyce Grimstead, the appellee/cross-appellant, brought a medical malpractice action against McNeal Brockington, M.D., the appellant/cross-appellee. The case was tried to a jury for six days and resulted in a verdict for Grimstead in the amount of $4,414,195, including $3,000,000 for non-economic damages. On a motion for remittitur, the non-economic damages award was reduced to $545,000, for a total judgment of $1,959,195.

The parties noted a timely appeal and cross-appeal, posing two questions for review, which we have rephrased as:

*By Brockington:*

I. Did the trial court commit reversible error by allowing two alternate jurors to attend jury deliberations and then substituting the alternates for two regular jurors during the deliberations?

**By Grimstead:**

II. Did the circuit court err in the amount by which it reduced the jury's award of non-economic damages?

We answer Brockington's question in the affirmative and therefore shall reverse the judgment and remand the case to the circuit court for further proceedings. Our disposition of that question obviates the need to address Grimstead's question.

## FACTS AND PROCEEDINGS

On November 14, 2003, Grimstead filed suit against Brockington, alleging that he negligently failed to diagnose and treat her cancer of the retroperitoneum [1] during the five-year period in which he was her primary care physician. When Grimstead's cancer eventually was diagnosed by another physician, in November of 2002, her prognosis was extremely poor and her probable life expectancy was short. Because the issues on appeal are procedural, we shall not give a detailed recitation of the facts that gave rise to the malpractice allegations.

Grimstead prayed a jury trial. The case came on for trial and jury selection began on November 1, 2005. After *voir dire*, but before selection of the jury, the judge discussed with counsel the number of alternates and the size of the jury, and asked whether they would consent to a verdict from five jurors if circumstances so required. Counsel for Grimstead consented but Brockington's counsel did not.

The judge reviewed counsel's peremptory strikes and expressed concern that Grimstead's lawyer had "managed to challenge ... the first five whites on the panel." He noted

---

**1.** The "retroperitoneum" is the posterior portion of the abdominal cavity. STEDMAN'S MEDICAL DICTIONARY 1456, 1686 (28th ed.2006).

that the remaining available jurors all were African–American and told counsel he was not "going to allow that." Brockington's lawyer interposed a *Batson* challenge.[2]

Counsel for Grimstead put on the record his reasons for each peremptory strike. The court found that the reasons given for striking one potential juror were improper, in that they were based on gender, and the reasons given for striking another potential juror, number 263, were "absolutely specious." [3] It also found, however, that Brockington's lawyer had stricken three of the same five potential jurors. On that ground, the court seated the jury, but reserved swearing in the jurors until the following day.

The next morning, the court told counsel that it had "secured [potential juror number 263]" and that, if they needed to "cure that issue," he could be seated as "Juror Number Four. Then they would all be bumped down by one." After further discussion with counsel about Grimstead's asserted reasons for striking each of the five jurors, the court made a finding that potential juror number 263 was improperly stricken by Grimstead's counsel and that the most appropriate remedy was to seat him as Juror Number 4. The court did so, over Grimstead's objection. The originally seated Juror Number 4 became Juror Number 5, and so forth. The resulting jury consisted of six regular jurors and four alternate jurors.[4] The jury was sworn and trial commenced.

---

2. *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).

3. Potential juror number 263 was a musician. Grimstead's lawyer explained that, while he usually finds musicians to be "fairly liberal when it comes to verdicts[,]" because this musician was a member of an orchestra—a "structured, well organized unit or team"—he might be more sympathetic to a physician who also functioned as part of a team.

4. Because four alternates were selected, rather than the three originally contemplated, each party was entitled to one additional peremptory challenge under Rule 2–512(h). The parties each waived this additional challenge.

On November 9, 2005, at the close of all the evidence, six regular jurors and two alternate jurors remained.[5] Later that day, after closing arguments, the court sent the regular jurors and the alternates home for the evening, and instructed all of them to return in the morning. The court and counsel then had the following discussion about the alternate jurors:

THE COURT: Counsel, I think tomorrow I am still going to have the two alternates just sit without participating in the discussion and if we need one, we do. If we don't, so be it. If any of you have any vigorous objection to that, let me know now.

[COUNSEL FOR PLAINTIFF]: I have a vigorous objection, Your Honor.

THE COURT: You do?

[COUNSEL FOR PLAINTIFF]: Yes.

THE COURT: To sitting in, but not participating in the discussion?

[COUNSEL FOR PLAINTIFF]: Absolutely. Completely unnecessary. If [all the jurors] return tomorrow, [the alternates] should be dismissed.

THE COURT: You know, I've had a medical malpractice case involving one of the [defense] attorneys here where the jury deliberated for five days, and I worry about situations like that in setting the stage. If you can come in with some authority, tomorrow morning I'll entertain it. I've done this in several other cases and no one's ever objected to having the [alternate] jurors sit in—my jury room is rather large—have the two alternates sit somewhere in the corner, just sit there and not participate in the discussion in the event that

---

**5.** Alternate Juror Number 3 was excused on November 2, 2005, because her employer would not compensate her for jury duty, causing great economic hardship.

Juror Number 1 was excused on November 4, 2005, after she alerted the court that her supervisor was present in the courtroom as a supporter of Grimstead. She was replaced by the person then designated as Alternate Juror Number 1.

one of them was pressed into service. So we will see where we are [tomorrow].

When court reconvened the next morning, November 10, the judge asked Grimstead's lawyer whether he had "some authority to the contrary" on the issue of the alternate jurors being present for, but not participating in, deliberations. Responding that he had not had time to research the issue and thus had no authority to offer, counsel nevertheless argued:

> I'm just trying to be pragmatic about this, and I'm thinking how can [the alternate jurors] be sitting in a room, and not participate, and if they are deliberating for hours, they are going to certainly hear everything that is going on. So when you say, they are not participating, I think they are participating. They are hearing everything. They are going to be hearing debates. It's inevitable they are going to hear that. . . . But I understand the Court's concern. If the Court is going to insist that the alternates remain, I would object, and I would, at a minimum, ask that they be somehow, I don't want to use the word quarantined, but I'd rather them not be there, because it may be impossible to prevent them from participating, just, even if the Court just gives them instructions. Just like you told them not to discuss the case, and they did, and I think hearing this and making faces, I don't see how they are going to divorce the process, even in a large room, they are hearing. I would feel more comfortable with them being somewhere separated.

Grimstead's co-counsel interjected that, if an alternate juror were present in the jury room, but not deliberating, and a regular juror then were excused and replaced, deliberations would have to start "from scratch," because the alternate would not have been participating in the deliberations previously. Thus, isolating the alternate jurors was preferable and would be no less efficient.

Brockington's counsel responded:

> Your Honor, I think the last trial [before you], which finished two weeks ago, we did the same thing, Your Honor

suggested. I didn't object then. I don't object now.... We wouldn't agree to take less than six.

The trial judge noted that he had used this same procedure many times previously without any objection. Moreover, he did not believe that the courthouse had an available location to sequester the two alternate jurors during deliberations, as Grimstead's lawyer had proposed. The judge did not "see where there [was] any harm" in the alternate jurors' listening to, but not participating in, the deliberations until such time as it might become necessary to substitute them.

Taking the court's statement as its ruling, Grimstead's lawyer asked, without withdrawing his objection, that the court instruct the alternate jurors not to react with facial expressions while they listened to deliberations. The jury then was called in and instructed as follows:

> The first six of you are the jury panel. The two in the back row are alternates. The six of you will participate in the discussion and try to resolve the issues that you have to decide. The two alternates will sit in the jury room, but you will sit apart from the jury. Sit on the sofa. You can listen in on the discussion, but you are not to participate.
>
> The reason I am doing this is because if there is a problem, we have to have six jurors. And if we should unfortunately lose one of you for whatever reason, we will have an alternate.

* * *

> So the six will sit at the table and participate in the discussion, and the two alternates remain in the jury room, you will listen to discussion, but you are not to participate. And I can't emphasize that enough.

* * *

> To the two alternates, during the discussions that you hear, I want you to remain as neutral as possible. You are not to make any facial expressions or body expressions whether you agree with something you hear or disagree with something you hear. You are not to reflect how you

feel about anything. Just sit there and listen and remain as neutral as possible.

The jurors retired to the jury room to begin deliberations shortly before 10:00 a.m.

That afternoon, the court received two notes: one from an alternate juror seeking to be excused until such time as he was needed to actually deliberate and the other from the jury foreperson reporting that "we are deadlocked at three and three."

Brockington's lawyer stated that, if the jury had not reached a verdict by the end of the day, "we would be inclined to move for a mistrial." The court announced its intention to allow deliberations to continue until the end of the day and to deny the alternate juror's request to be excused.

Later that afternoon, the jurors were brought into the courtroom, reminded that the next day (a Friday) was a court holiday (Veteran's Day), and told that they need not report. They were instructed to return on Monday to continue deliberations. The court also acknowledged receipt of the two notes, but told the jurors that they would need to continue their deliberations.

When the jurors reported on Monday morning, November 14, Juror Number 4 presented the court a letter from his doctor and a note in which the juror asked to be excused from service. In the note, the juror stated that he was scheduled to receive immunization shots the next day, November 15, for an upcoming trip to Indonesia. According to the doctor's letter, the juror had a "damaged heart" and should not have been serving on a jury at all.

Counsel were asked their views about Juror Number 4's request, to which Brockington's lawyer responded:

Your honor, juror number 4 was a juror in whom we have had the greatest confidence because he seemed to be from my observations, one of the most attentive jurors. He was taking notes the whole time. We feel it would be extremely prejudicial to the defense to have him stricken at this time.

Counsel added that, because the jury apparently was dead-locked, it would be prejudicial to "disturb the dynamics of the jury for either side."

Grimstead's lawyer disagreed and moved to replace Juror Number 4 with one of the alternate jurors. Juror Number 4 was the person who was the subject of the *Batson* violation by Grimstead's counsel during jury selection; and who had been seated on the jury to remedy the violation.

Brockington's lawyer suggested that the jury, as constitut-ed, be allowed to deliberate until the end of the day. The court agreed, prompting Grimstead's counsel to inquire why the alternates had been retained if they would not be used to substitute under these circumstances. The court responded: "[T]wo things. First of all, he [referring to Juror Number 4] was one of the initial jurors and that's something that weighs with me. Secondly, I'm not impressed at all with his [ex-cuse]."

Juror Number 4 then was called before the court and instructed to keep deliberating for the rest of the day. Before deliberations resumed, the jurors were given an *Allen* charge.[6]

At 2:00 p.m. that same day, the jury foreperson again sent a note to the judge stating that the jurors were deadlocked, three to three. The jury was instructed to continue deliberat-ing. At 4:35 p.m., Brockington's lawyer moved for a mistrial, asking the court to declare a hung jury if the jurors did not return a verdict that day. Counsel also objected to any substitution of an alternate juror for Juror Number 4. He advanced five reasons in support. First, a substitution would undo the previously imposed *Batson* remedy. Second, Alter-nate Juror Number 1, who ostensibly would replace Juror Number 4, was female while Juror Number 4 was male. This was problematic because, during jury selection, Grimstead had improperly cited gender as a reason for striking a juror.

---

**6.** *Allen v. United States,* 164 U.S. 492, 17 S.Ct. 154, 41 L.Ed. 528 (1896) (holding that an instruction to jurors to listen to and give consideration to the opinions of fellow jurors was constitutionally permissible).

Third, the court had not excused Alternate Juror Number 2 when he raised work-related concerns on day one of the deliberations. Fourth,

> We also took a look at some case law and there is a 2004 case actually that received considerable publicity, ... [*Stokes v. State,*] 379 Md. 618, 843 A.2d 64 and that case stated that ... "There can be no doubt that despite his good intentions and attempt to cure the air, the judge erred by allowing the alternates to attend any part of the jury deliberations."

> So, at this point, while we did not object to the court permitting alternates to go to deliberate, at this point if the court is prepared to substitute juror number four with one of the alternates we do object and we no longer waive that objection, we make the objection that the alternates not be permitted to participate in the deliberations.

And last, Brockington's counsel observed that, if Juror Number 4 were excused, counsel for both parties would be entitled to talk to him if they were so inclined. Thus, they could find out the status of the deliberations midway through, which would be "very intrusive to the jury functioning[.]"

In summarizing his positions, Brockington's counsel redirected the court's attention to *Stokes,* stating:

> Obviously we could waive it, but at this point I no longer waive my objection to the alternates being in the jury room and witnessing the deliberations.

> [*Stokes* ] is a complicated case, it's a criminal case, but Maryland [R]ule 2–512[ (b) ] addresses alternate jurors and it states at the very end of that sub[ ]paragraph and I quote, "An alternate juror who does not replace a juror shall be discharged when the jury"—

> THE COURT: That's a criminal statute you're reading.

> [COUNSEL FOR DEFENDANT]: No, actually, I'm reading from the civil. The criminal one is identical on that and has the same sentence.... 2–512[ (b) ] and it states that "an alternate juror who does not replace a juror shall be discharged when the jury retires to consider it's verdict." And

of course we could waive that. [Grimstead's counsel] did not waive it. I waived it earlier, but I no longer waive it.

Grimstead's lawyer countered that defense counsel had "already waived any argument he ha[d]" about the alternates being allowed in the jury room during deliberations and argued that Juror Number 4 should be replaced with an alternate.

The court denied the motion for mistrial; asserted that it had complied with *Stokes* by instructing the alternate jurors not to participate in the deliberations; and excused Juror Number 4 from further service. The remaining members of the jury then were dismissed for the day.

Thereafter, the court briefly discussed with counsel a note it had received from Juror Number 6 requesting to be excused because her employer would no longer pay her. The court declined to excuse that juror because "[s]he doesn't have a medical excuse."

Shortly after 10 a.m. the next day, November 15, the court received a letter from Juror Number 5's doctor stating "he's off work/jury duty [November 15]-[November 16, 20]05." The court called in the jury and dismissed Juror Number 5, without any inquiry. It then substituted Alternate Juror Number 1 for the previously dismissed Juror Number 4 and substituted Alternate Juror Number 2 for Juror Number 5. The jury as reconstituted was sent to the jury room to deliberate. The court did not instruct the jurors about the process they should follow, *i.e.*, whether they should start deliberating anew or pick up deliberations where the original jury had left off.

Brockington's lawyer renewed his objection to the substitution of alternate jurors for regular jurors:

Both [excused] jurors are the most educated jurors on this panel. [Juror Number 4] has 18 years of education. [Juror Number 5] has 16 years of education. The jury was deadlocked three to three. I obviously don't know how they're voting, who's voting which way, but I would tend to think

because of the tremendous sympathy in this case that it favors me to have the most educated jurors on the panel.

\* \* \*

... I think the *Stokes* case is directly on point and under the circumstances it's improper at this point to let the alternates now start deliberating once the other members of the jury were no longer able to deliberate and I do not, I am not willing to go with less than the six original jurors who were asked to deliberate, so I object, your honor.

The court reasserted that, by instructing the alternates not to participate in deliberations prior to their substitution, it had complied with *Stokes* and therefore defense counsel's "motion is denied." [7]

Later that afternoon, the court received a note from the jury asking for clarification of the instruction on the law of proximate causation. At that time, Brockington's counsel renewed his objection "to this process" and cited to a second case, *Hayes v. State*, 355 Md. 615, 735 A.2d 1109 (1999), as authority for the proposition that alternate jurors may not be substituted for regular jurors once deliberations have begun. The court asked for the case citation from counsel, but opined:

I wanted to point out that in civil [cases], there are procedures for alternates to deliberate if agreed by counsel and ironically it was [counsel for the defendant] who did not object to the alternates going in along the procedure I outlined and [counsel for plaintiff] obviously is not objecting at this juncture to that process or procedure.

Defense counsel responded that he believed that he could object at "anytime before the jury verdict comes back."

At 3:07 p.m., the jury reached a verdict. Before the verdict was taken, Brockington's lawyer "renew[ed his] objection for the umpteenth time to this process."

---

7. Defense counsel did not phrase his objection as a renewed motion for mistrial, but the court treated it as such.

As discussed above, the jury found for Grimstead and awarded her $4,414,195 in damages.

Brockington filed a timely motion for new trial or, if that request were denied, for remittitur pursuant to the statute capping recovery of non-economic damages. *See* Md.Code (2006 Repl.Vol.), § 11–108(b) of the Courts and Judicial Proceedings Article ("CJ"). The court denied the new trial motion, but granted a remittitur, reducing the total damages awarded to $1,959,195.

## DISCUSSION

### (a)

### *Contentions*

Brockington contends the trial court erred as a matter of law by not discharging the two remaining alternate jurors when the regular jurors retired to deliberate; by allowing the alternate jurors to sit in on deliberations as observers; and by substituting the alternate jurors for two regular jurors in the midst of deliberations. He argues that Rules 2–511 and 2–512 and Maryland case law interpreting them make plain that alternate jurors may not be retained after the regular jurors retire to deliberate, may not observe or participate in deliberations, and may not be substituted for deliberating regular jurors. He maintains that these missteps by the court were legal rulings, which are to be reviewed *de novo* for error; and that the rulings were legally erroneous. He further maintains that this error was presumptively prejudicial and therefore requires reversal of the judgment.

Grimstead does not contest the legal underpinnings to Brockington's contention. Instead, she argues that Brockington consented to the alternate jurors' being retained after the regular jurors retired to deliberate and to the alternate jurors' being present in the jury room during deliberations; and that, by doing so, he waived any objection to the actual substitution of alternate jurors for regular jurors during deliberations, as the implicit purpose of his original agreement to retain the

alternates was to allow substitutions to happen, if necessary. She maintains that Brockington's objection to the substitutions immediately before they were made was "a complete about-face" by which he "attempted to withdraw [his] consent to the procedure for dealing with alternate jurors" for the "cynical" purpose of "manipulat[ing] the jury process" to keep on the jury the two regular jurors he thought would be favorably disposed to the defense. Grimstead further asserts that, because Brockington consented to the process that led to the substitutions, the trial court's rulings should be evaluated for abuse of discretion, not legal error; and that the court did not abuse its discretion.

In reply, Brockington argues that he did not waive the issue of alternate juror substitution because he timely and repeatedly objected to the court's rulings substituting the two alternate jurors for regular jurors during deliberations. He notes that the objections brought the controlling law to the court's attention before it made the substitution error, and if granted, would have averted that error. He points out that, given that objections must be contemporaneous, *see* Md. Rule 2–517(c), the issue of alternate juror substitution did not arise until the jurors were deliberating, and that he objected at every step once the issue did arise; therefore, he did not waive an objection to the alternate juror substitution issue. He also asserts that at no time before the issue of substitution arose did his counsel consent to alternate jurors being substituted for regular jurors; at the very most, defense counsel agreed to the alternate jurors being present during deliberations, which is not the same as consenting to substitution.

Alternatively, Brockington argues that the requirements of Rule 2–512 are structural, and cannot be waived in any event.

### (b)

### *Applicable Law On Alternate Jurors*

In Maryland, civil litigants enjoy the right to a trial by a jury of no less than six members in all causes of action in which the amount in controversy exceeds $10,000 and a jury

trial rightfully could have been demanded at common law. *See* Md. Decl. of Rights, Art. 5; CJ § 8–421(a); Md. Rule 2–511(b). They may, however, consent to "accept a verdict from fewer than six jurors if during the trial one or more of the six jurors becomes or is found to be unable or disqualified to perform a juror's duty." Md. Rule 2–511(b).

In addition to the selection of six regular jurors, the court may allow the selection of alternate jurors, as provided in Rule 2–512(b):

(b) **Alternate Jurors.** The court may direct that one or more jurors be called and impaneled to sit as alternate jurors. *Any juror who, before the time the jury retires to consider its verdict, becomes or is found to be unable or disqualified to perform a juror's duty shall be replaced by an alternate juror in the order of selection.* An alternate juror shall be drawn in the same manner, have the same qualifications, be subject to the same examination, take the same oath, and have the same functions, powers, facilities, and privileges as a juror. *An alternate juror who does not replace a juror shall be discharged when the jury retires to consider its verdict.*

(Emphasis added.)

Although there are no appellate decisions construing Rule 2–512(b), the Court of Appeals twice has interpreted its criminal counterpart, Rule 4–312(b), which is nearly identical. The criminal rule provides:

(b) **Alternate jurors.** (1) Generally. An alternate juror shall be drawn in the same manner, have the same qualifications, be subject to the same examination, take the same oath, and have the same functions, powers, facilities, and privileges as a juror.

\* \* \*

(3) Non-capital cases ... [T]he court may direct that one or more jurors be called and impanelled to sit as alternate jurors. *Any juror who, before the time the jury retires to consider its verdict, becomes or is found to be unable or disqualified to perform a juror's duty, shall be replaced by*

*an alternate juror in the order of selection. An alternate juror who does not replace a juror shall be discharged when the jury retires to consider its verdict.*

(Emphasis added.)

In *Hayes v. State,* 355 Md. 615, 735 A.2d 1109 (1999), the Court of Appeals construed the directive in Rule 4–312(b)(3) that alternate jurors be discharged "when the jury retires to consider its verdict." There, the defendant was tried by a jury for robbery with a deadly weapon and related charges. Following closing arguments, the court discharged the only remaining alternate juror and instructed the regular jurors to retire to the jury room. Shortly thereafter, the court reconvened after learning that a juror had fallen ill "before [the members of the jury were to] begin deliberations." *Id.* at 618, 735 A.2d 1109. The court informed the parties that, although the alternate juror had been excused, he had not yet left the courthouse. The court recalled the previously excused alternate juror and announced its intention to substitute him for the ailing juror.

Defense counsel objected, arguing that the regular juror did not appear ill earlier in the day. The court made the substitution over defense counsel's objection, stating, "deliberations will now be begun. They have not yet begun." *Id.* The newly constituted jury returned a conviction. On appeal, the defendant argued in part that "an alternate juror may not be substituted after the jury retires to deliberate." *Id.*

Noting that the issue was one of first impression, the Court of Appeals considered several possible meanings of the phrase "when the jury retires to consider its verdict," opining that it could refer to

the point at which the judge directs the jury to retire, the time when the jury actually leaves the courtroom (whether or not it intends to report directly to the jury room to begin deliberations), the time when the jury enters the jury room to begin deliberations and closes the door, or when the jury actually begins to discuss the case behind the closed door.

*Id.* at 622, 735 A.2d 1109. The Court observed that the effect of a violation of the rule similarly was a matter of first impression.

For guidance, the Court looked to decisions of the federal courts and various state courts interpreting comparable local statutes or rules. The cases fell into two categories: those in which an alternate juror was substituted prior to the commencement of deliberations and those in which the substitution occurred after deliberations had begun. In the former category, the cases all had upheld the substitution. In the latter category, the results varied depending upon the precise wording of the applicable statute or rule and whether an objection had been raised.

The federal courts consistently had sustained substitutions occurring in both categories of cases. At that time, Federal Rule of Criminal Procedure 24(c) contained language identical to Rule 4–312(b)(3), permitting substitution of an alternate juror for a regular juror "prior to the time *the jury retires to consider its verdict.*" (Emphasis added.) Rule 24(c) recently had been amended, although the amendment had not yet been approved by Congress or taken effect,[8] to provide as follows:

> When the jury retires to consider the verdict, the court in its discretion may retain the alternate jurors during deliberations. If the court decides to retain the alternate jurors, it shall ensure that they do not discuss the case with any other person unless and until they replace a regular juror during deliberations. If an alternate replaces a juror after deliberations have begun, the court shall instruct the jury to begin its deliberations anew.

---

8. The amendment as adopted by the Supreme Court later was further amended by Congress to read as follows:

 (3) *Retaining Alternate Jurors.* The court may retain alternate jurors after the jury retires to deliberate. The court must ensure that a retained alternate does not discuss the case with anyone until that alternate replaces a juror or is discharged. If an alternate replaces a juror after deliberations have begun, the court must instruct the jury to begin its deliberations anew.

The Court of Appeals observed that the recent amendment essentially "authorize[d], in a more direct way, what many Federal courts had been doing anyway, using a very liberal harmless error analysis to sustain what were clear violations of the [prior version of the] rule." *Id.* at 626, 735 A.2d 1109 (recounting a litany of cases in which federal district courts had ignored the mandates of Rule 24(c) in its prior form and federal appellate courts had upheld the rulings for harmless error or non-prejudice [9]).

According to the Court, this practice culminated in *United States v. Olano*, 507 U.S. 725, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993), in which a 14-juror panel initially had been selected, with the consent of the parties, with none designated as alternates until after closing arguments. At that time, the court designated two jurors as alternates and allowed them to return to the jury room with the regular jurors. The alternate jurors were instructed not to participate in the deliberations. The defendant did not object. During the deliberations, one of the alternate jurors was excused. The other alternate juror remained with the jury until it rendered its verdict, convicting the defendant.

On appeal, the Court of Appeals for the Ninth Circuit reversed, holding that Rule 24(c) was violated, the error was plain, and the violation was inherently prejudicial. The Supreme Court granted *certiorari* and vacated the Ninth Circuit's judgment. The Court agreed that Rule 24(c) was violated and that the error was plain, but held that the defendant did not demonstrate prejudice, *i.e.*, that the "error 'affect[ed] substantial rights' within the meaning of [Federal Rule of

---

**9.** The improper procedures included allowing an alternate to sit in for a portion of deliberations before being discharged, *United States v. Allison*, 481 F.2d 468 (5th Cir.1973), retaining and substituting three previously sequestered alternate jurors in the midst of deliberations, *United States v. Phillips*, 664 F.2d 971 (5th Cir.1981), and even substituting an alternate midway through deliberations when there was evidence the alternate juror had discussed the case with a second alternate prior to the substitution, *United States v. Hillard*, 701 F.2d 1052 (2nd Cir.1983).

Criminal Procedure] 52(b)." *Olano, supra,* 507 U.S. at 737, 113 S.Ct. 1770.

The Court of Appeals in *Hayes* rejected the federal approach, holding:

We are not at liberty, in a decisional context, to change the language of Rule 4–312(b)(3), and we refuse to embark on the Federal approach of circumventing the rule through an expansive harmless error or presumptive non-prejudice doctrine that is entirely foreign to our jurisprudence. . . .

[W]e conclude that an alternate juror who remains qualified to serve may be substituted for a regular juror who is properly discharged, *until such time as the jury enters the jury room to consider its verdict and closes the door.*

*Hayes, supra,* 355 Md. at 635, 735 A.2d 1109 (emphasis added). Such a standard is practical and workable, the Court reasoned, because "compliance with it can be established through objective and extrinsic evidence" rather than by requiring inquiry into what went on behind closed doors, *i.e.,* when deliberations actually started. This approach, according to the Court, "involves a minimum of inconvenience, moots the argument that an alternate juror, once formally discharged, may not be recalled, and should assure that alternate jurors remain qualified to substitute until the time that substitution is no longer permissible." *Id.* at 637, 735 A.2d 1109 (footnote omitted). Because the alternate juror in *Hayes* had been substituted after the jurors had entered the jury room and closed the door, the Court reversed the conviction.

Five years later, in *Stokes v. State,* 379 Md. 618, 843 A.2d 64 (2004), the Court of Appeals considered the legal effect, if any, of the presence of alternate jurors in the jury room during deliberations, without substitution. There, the defendant entered a plea of not criminally responsible and elected a bifurcated trial pursuant to Rule 4–314. That Rule gives the defendant a "single continuous trial in two stages"; the issue of guilt is tried first and, if the defendant is found guilty on any count, the issue of criminal responsibility then is tried. Md. Rule 4–314(b). The same jury hears both stages of the

trial. The Rule also requires that at least two alternate jurors be selected and that they be "retained throughout the trial." *Id.*

Twelve regular jurors and four alternates were selected and the guilt/innocence stage of the trial commenced. At the conclusion of that stage, the trial court instructed all sixteen jurors as follows:

Madam Forelady, ladies and gentlemen, under the Rule 4–314 that creates a bifurcated trial, at the present time, you are all jurors. You are not both jurors and alternates, even though we so designated you.

*Id.* at 623, 843 A.2d 64. The jurors then were instructed that their verdict had to be unanimous. Defense counsel objected to the alternate jurors' being permitted to deliberate, but the objection was overruled.

The jury deliberated for 30 minutes that day, recessed for the weekend, deliberated an additional two hours the following Monday, and then sent a note to the court asking, "Do alternates count?" *Id.*

In the discussion with counsel that followed, the trial judge said that he understood the requirement in Rule 4–314, that alternate jurors be "retained throughout the trial," to mean that the alternate jurors were to deliberate during the first stage of the bifurcated trial but were to be discharged prior to deliberations in the second stage. After further discussion, the court reconsidered and decided to instruct the alternate jurors that they were to be "mere observers" during deliberations in the first stage. The jurors were so instructed and all sixteen again retired to the jury room. Defense counsel renewed his objection to the presence of the alternate jurors in the jury room during deliberations.

The jury convicted the defendant on three counts. The defendant subsequently withdrew his plea of not criminally responsible in exchange for a favorable sentencing recommendation from the State. After sentence was imposed, he appealed his conviction. The Court of Appeals granted *certiora-*

*ri* prior to disposition in this Court. 376 Md. 543, 831 A.2d 3 (2003).

The Court of Appeals reversed the convictions. It held that, even in a bifurcated trial pursuant to Rule 4–314, it was error to allow alternate jurors "into the jury room to deliberate" and that, once deliberations commenced with the alternate jurors participating, the "error could not be cured." *Id.* at 629–30, 843 A.2d 64. The Court noted that "under Maryland law, unlike the procedure in some other states, an alternate juror may not be substituted" after jury deliberations have begun. *Id.* at 630, 843 A.2d 64. Accordingly, "the deliberations of the regular jurors are of no concern to the alternates." *Id.*[10]

The *Stokes* Court next addressed the effect of the error. Characterizing alternate jurors not as strangers to the jury, but as third parties, the Court emphasized, as it had in *Hayes,* the sanctity of the jury room when deliberations are underway. Once the jurors enter the jury room with the alternates, it is extraordinarily difficult to determine what occurred because "inquir[y] into jury motives is, to a large degree, proscribed by rule [5–606]." *Id.* at 635, 843 A.2d 64 (quoting *Jenkins v. State,* 375 Md. 284, 316, 825 A.2d 1008 (2003)).

The Court held that a presumptive prejudice standard should apply, stating:

> We consider the presence of alternate jurors during the jury deliberations as sufficiently impinging upon the defendants's constitutional right to a jury trial as guaranteed by the Maryland Constitution and Maryland Rules of Procedure to create a presumption of prejudice. Jury deliberations are private and are to be conducted in secret. . . . The presence of alternate jurors who have no legal standing as

---

**10.** *See also James v. State,* 14 Md.App. 689, 699, 288 A.2d 644 (1972) (commenting upon interpretation of former Rule 748, which does not differ substantially from Rule 4–312(b): "It is pellucid that Maryland's [alternate] juror rule provides for a substitution or replacement of regular jurors by alternates up to the juncture occurring when the jury retires to deliberate its verdict. There is no provision in this State's rule for substitution of an alternate juror thereafter.").

jurors injects an improper outside influence on jury deliberations and impairs the integrity of the jury trial. *Prejudice must be presumed where alternates breach the sanctity of the jury room.*

*Id.* at 638, 825 A.2d 1008 (emphasis added) (internal citations omitted).

The Court also quoted with approval a decision of the Supreme Court of North Carolina, *State v. Bindyke*, 288 N.C. 608, 220 S.E.2d 521 (1975), stating:

"The rule formulated by the overwhelming majority of the decided cases is that the presence of an alternate, either during the entire period of deliberation preceding the verdict, *or* his presence at any time during the *deliberations* of the twelve regular jurors, is a fundamental irregularity of constitutional proportions which requires a mistrial or vitiates the verdict, if rendered. And this is the result notwithstanding the defendant's counsel consented, or failed to object, to the presence of the alternate."

*Stokes, supra,* 379 Md. at 639, 843 A.2d 64 (emphasis in original) (quoting *Bindyke, supra,* 288 N.C. at 623, 220 S.E.2d 521). In a footnote, the Court added that, since the Supreme Court's decision in *Olano, supra,* some courts have modified this approach when no objection was made, but that preservation was not at issue because Stokes's counsel indeed objected below.

Proposed but rejected amendments to Rule 2–512(b) and its criminal counterpart, Rule 4–312(b), also are germane to our analysis. On July 30, 2003, the Standing Committee on Rules of Practice and Procedure ("Rules Committee") submitted its 152nd Report recommending amendments to Rules 2–512(b) and 4–312(b). Under the proposed amendments, Rule 2–512(b) would read as follows:

(b) **Alternate Jurors**

(1) **Generally**

The court may direct that one or more jurors be called and impanelled to sit as alternate jurors. Any juror who, *before the time the juror's service is completed,* becomes or

is found to be unable or disqualified to perform a juror's duty shall be replaced by an alternate juror in the order of selection. An alternate juror shall be drawn in the same manner, have the same qualifications, be subject to the same examination, take the same oath, and have the same functions, powers, facilities, and privileges as a juror. *An alternate juror who does not replace a juror shall be discharged at such time as the court concludes that the juror's service is completed.*

### (2) Retaining Alternate Jurors

*The court may retain alternate jurors after the jury retires to deliberate. The court shall ensure that a retained alternate does not discuss the case with anyone until that alternate replaces a juror or is discharged. If an alternate replaces a juror after deliberations have begun, the court shall instruct the jury to begin its deliberations anew.*

(Emphasis added.) The Reporter's Note explained that the proposed amendments "reflect[ed] a change in the policy underlying the current rule as enunciated in *Hayes v. State,* 355 Md. 615, 735 A.2d 1109 (1999)." The proposed amendments to Rule 4–312(b) exactly paralleled the amendments to the civil rule; and the Reporter's Note referred back to the note accompanying Rule 2–512.

On November 12, 2003, the Court of Appeals considered and rejected the proposed amendments to both rules. Since then, no further amendments have been proposed.

### (c)

### *Has Brockington Waived the Arguments He Advances on Appeal?*

In the appellate setting, the general waiver rule holds that "a voluntary act of a party which is inconsistent with the assignment of errors on appeal normally precludes that party from obtaining appellate review." *Franzen v. Dubinok,* 290 Md. 65, 69, 427 A.2d 1002 (1981). *See also Osztreicher v. Juanteguy,* 338 Md. 528, 534, 659 A.2d 1278 (1995) (noting that " '[t]he right to appeal may be lost by

acquiescence in, or recognition of, the validity of the decision below from which the appeal is taken or by otherwise taking a position which is inconsistent with the right of appeal' ") (quoting *Rocks v. Brosius,* 241 Md. 612, 630, 217 A.2d 531 (1966)); *Williams v. Maryland Dept. of Human Res.,* 136 Md.App. 153, 176, 764 A.2d 351 (2000). Grimstead invokes the general waiver rule to argue that Brockington consented to the jury deliberation process employed in this case and therefore cannot attack it on appeal. Specifically, she maintains that Brockington agreed that the alternate jurors would be retained after the regular jurors had retired to consider their verdict, that the alternate jurors would observe the deliberations, and that, if necessary, alternate jurors would be substituted for deliberating regular jurors; and having done so, he cannot now challenge the adverse verdict on the ground that the procedure he consented to, and that was followed, is not permitted by Maryland law.

As our recitation of the pertinent procedural facts discloses, the critical exchanges among the court and counsel about alternate jurors took place following closing arguments.[11] At

---

**11.** The exchanges that took place before the closing arguments concluded were ambiguous, in that it was not clear whether Brockington's lawyer was agreeing to a process that would allow the alternate jurors to join the regular jurors, to form a jury of eight, or whether he was agreeing to a process by which the alternate jurors would be retained and, if necessary, used as substitutes for regular jurors during the deliberations. For example, after it was decided that counsel would choose three alternate jurors in addition to the six-person jury, the following exchange took place:

THE COURT: If at the end of the case we have three alternates left, can they all deliberate?
[COUNSEL FOR PLAINTIFF]: That's something I would like to reflect on, to see how the trial goes.
THE COURT: Okay.
[COUNSEL FOR DEFENDANT]: I have no objection to letting everybody who is still available when the case is sent to the jury—
Later during the trial, the court asked counsel if they had "given any thought to the issues I raised about jurors?" Grimstead's lawyer replied, "We would prefer not to have the alternates deliberate, Judge, and come back tomorrow." The court responded, "I'm not going to let these alternates leave and not have them come back under these

that point, the court informed counsel that it was going to have the alternate jurors sit in on the deliberations, without participating, "and if we need one, we do...." Grimstead's lawyer objected to such a process; Brockington's lawyer made no comment. The next morning, Grimstead's lawyer continued to object. Brockington's lawyer said he did *not* object.

The record thus reflects that, through counsel, Brockington expressly consented to a jury deliberation procedure contrary to Rule 2–512(b), by which the alternate jurors would not be discharged when the regular jurors retired to deliberate; and that he implicitly consented to a jury deliberation procedure that allowed the possibility of alternate jurors' being substituted for regular jurors during deliberations, also contrary to Rule 2–512(b). Because Grimstead would not consent to any such procedure, however, the trial judge made a ruling, stating that he would follow his past practice of retaining alternate jurors after the close of the evidence and sending them into the jury room to observe the deliberations but not participate in them. The six regular jurors and the two alternate jurors retired to the jury room, and deliberations started.

By late afternoon on the second day of deliberations, the jurors had sent two notes declaring that they were deadlocked three to three, and Juror Number 4 had submitted a note from a doctor in an effort to be excused from the jury. Brockington's lawyer moved for a mistrial, on the ground that the jury was hung. Contemporaneously, he objected to any substitution of Juror Number 4 by an alternate juror. In doing so, he retracted his prior express consent to the alternate jurors' being retained and sent into the jury room with the regular jurors ("I no longer waive my objection to the alternates being in the jury room and witnessing the deliberations."); as we have explained, that prior express consent had carried with it the implied consent to the possible substitution of alternate jurors for regular jurors. Grimstead's counsel objected, stating, in essence, that Brockington could not with-

---

circumstances where you won't go with more than six and the Defense won't go with less[.]"

draw his prior consent, midstream, to the procedure he had supported. The court did not rule on Grimstead's objection.

From that point on, when the circumstance arose that required a ruling on whether alternate jurors could be substituted for regular jurors during deliberations, Brockington's counsel made timely objections, under Rule 2–517(c), on grounds that included the legal arguments he now advances on appeal, *i.e.*, that, under Rule 2–512 and controlling Court of Appeals decisional law, the substitutions were impermissible. (Rule 2–517(c) provides that, with respect to non-evidentiary rulings, "it is sufficient" for purposes of appellate review "that a party, at the time the ruling or order is made or sought, makes known to the court the action that the party desires the court to take or the objection to the action of the court." Md. Rule 2–517(c); *see also Burke v. Assocs. Loan Co.*, 210 Md. 211, 212, 123 A.2d 206 (1956) (holding that a party must make his objection to a ruling known to the court when the ruling is made)).

When the court decided to substitute the alternate jurors for Jurors Number 4 and 5, it rested its ruling not on waiver or consent but on its understanding that Rule 2–512(b), unlike Rule 4–312(b), permits alternate jurors to be retained and substituted for regular jurors, if need be. The court expressly rejected the legal argument presented by Brockington's counsel in opposition to substitution, ruling that the procedure it was following was permitted by the applicable civil rule and by case law, specifically, *Stokes v. State, supra.* The court discharged Juror Number 4 from service on that ground; the next day, it dismissed Juror Number 5 on the same legal ground, after Brockington's lawyer renewed his objection to any substitution.

If we assume, for the sake of this discussion, that the requirements of Rule 2–512 are susceptible of being waived, we must decide whether Brockington effectively revoked his consent to waive some or all of those requirements; and, if so, whether the general waiver rule therefore does not bar Brock-

ington from advancing some or all of the arguments he makes on appeal.

It is Grimstead's position that, having consented to waive the requirements of Rule 2–512, Brockington could not change his mind, withdraw his consent, and then complain on appeal about the process that was used. Moreover, if Brockington could withdraw his consent, this Court should not recognize his doing so, because he did so only for the purpose of manipulating the composition of the jury to his liking. Brockington counters that his initial consent to waive the Rule 2–512 requirements could be revoked, at least in part, and that it was revoked; and because the substitutions were made after he revoked his consent, and over his express objection, he is not precluded by the general waiver rule from challenging the substitutions on appeal.

 Generally, a waiver is the intentional relinquishment of a known right, or conduct that warrants such an inference. *Myers v. Kayhoe*, 391 Md. 188, 205, 892 A.2d 520 (2006); *Creveling v. GEICO*, 376 Md. 72, 96, 828 A.2d 229 (2003). It may be effected by words, acts, or conduct. *See* Richard A. Lord, 13 *Williston on Contracts*, § 39:14 (4th ed.) (noting that waiver "may be accomplished either expressly or impliedly through conduct"). An effective waiver of a right extinguishes the waiving party's ability to raise any claim of error based upon that right. *Olano, supra*, 507 U.S. at 733–34, 113 S.Ct. 1770. A waiver differs from a forfeiture; the latter is the consequence of a party's failure to timely assert a right. *Id.* Thus, a party who validly waives a right may not complain on appeal that the court erred in denying him the right he waived, in part because, in that situation, the court's denial of the right was not error. By contrast, if a court errs by denying a party a right, but the party fails to timely object or otherwise invoke the right, the party forfeits his right to challenge the court's error on appeal.

 Ordinarily, when a party has waived a right and then retracts his waiver, the effect of the retraction is to revive the

right, subject to the doctrine of equitable estoppel. That doctrine

> lies at the foundation of the law of waiver because estoppel arises as a result of the voluntary conduct of one party, whereby he is precluded from asserting a right as against another person who has, in good faith, relied upon such conduct and has been led thereby to change his position for the worse.

*Arnold Bernstein Shipping Co. v. Tidewater Commercial Co.*, 84 F.Supp. 948, 952 (D.Md.1949). In other words, a waiver cannot be revoked when the opposing party has relied upon it and would be prejudiced by the revocation or the revocation would result in an improper manipulation of the judicial process.

*See Hibbard Brown & Co., Inc. v. ABC Family Trust*, 772 F.Supp. 894 (D.Md.1991) (noting that, in light of strong federal policy in favor of arbitration, a party that waived its right to arbitrate by filing a court action may revoke its waiver unless the opposing party would be prejudiced by the revocation or the revocation would result in improper manipulation of the judicial process). *Cf. Rad Concepts, Inc. v. Wilks Precision Instrument Co., Inc.*, 167 Md.App. 132, 162–64, 891 A.2d 1148 (2006) (explaining in the context of commercial contract dispute that when one party repudiates a contract and then retracts the repudiation, the repudiating party's rights under the contract are reinstated, unless, prior to the retraction, the other party cancelled the contract, materially changed its position, or otherwise indicated that it considered the repudiation final; interpreting Md.Code (2003 Repl.Vol., 2005 Supp.) section 2–611 of the Commercial Law Article); RESTATEMENT (SECOND) OF CONTRACTS, section 256 (stating that retraction will nullify the effects of repudiation if done before either party changes position in reliance upon the retraction or communicates that it considers the retraction to be final).

■ Likewise, the retraction of a waiver of a right must be timely. First, it must be accomplished when the right still is susceptible of being revived. *See, e.g., Kaplan v. RCA*

*Corp.*, 783 F.2d 463, 466 n. 2 (4th Cir.1986) (holding that, when the defendants waived their right to have a jury decide certain factual issues and, as a consequence, the court made those factual findings, they "cannot now retract their jury trial waiver"). Second, consistent with the equitable estoppel principles, the court has discretion to reject a party's retraction of a waiver if by its timing the attempted retraction would interfere with the administration of the court's business or would amount to a trial tactic, aimed at manipulating the judicial process.

In *State v. Jones*, 270 Md. 388, 312 A.2d 281 (1973), for example, the defendant elected a jury trial. After the jury was selected, he was unhappy with its composition, and moved to discharge the jurors and start jury selection anew. When the court denied that motion, the defendant waived his right to a jury trial and then requested a postponement, ostensibly to allow him to interview a newly found witness. The postponement was granted, as was a second postponement to extend the defendant's time for trial preparation. Yet a third postponement was granted after the court allowed the defendant to discharge his court-appointed counsel, so he could obtain private counsel. When, after the defendant did not obtain private counsel and the court appointed a second lawyer for him, and the case again came on for trial, the defendant sought to retract his waiver. The trial court refused to accept the retraction on the ground that the waiver, postponements, and attempted retraction of the waiver all were a ploy to obtain a jury other than the one properly selected on the first trial date. On appeal, the Court of Appeals held that in those circumstances the trial court did not abuse its discretion by refusing to allow the defendant to retract his jury trial waiver.

In those federal circuits where the courts of appeals have held that the requirements of Rule 24 are subject to being waived, the courts also have commented upon the related issue of revocation of waiver. In *United States v. Cencer*, 90 F.3d 1103 (6th Cir.1996), the court held that the prohibition in Rule 24(c) against substituting alternate jurors after submission of the case to the original jury can be waived. There, immedi-

ately before closing arguments on a Friday morning, the trial judge reminded counsel that two of the 12 regular jurors could not stay to deliberate during the following week, and suggested that two alternate jurors sit in on the deliberations so they could be substituted for regular jurors, if necessary. Counsel for both parties affirmatively agreed to that procedure.

Ultimately, during deliberations, the trial court substituted the two alternate jurors for the two regular jurors who had to leave. The defendant did not object to the substitutions (nor did the government). After convictions were returned, the defendant appealed, arguing that the trial court had erred by not following the requirements of Rule 24(c); that he did not waive the requirements of Rule 24(c); and that, while he had forfeited his right to challenge the court's error, by not objecting, that error was subject to plain error review.

The appellate court held that the defendant had waived the requirements of Rule 24(c), not forfeited his right to object to them, and hence there was no error on the part of the court in not adhering to the requirements of that rule. In so holding, the court made the following comment:

> In sum, we hold that where, as here, the defendant *affirmatively consents* to a procedure in which alternate jurors are silently present during initial jury deliberations, in anticipation of a possible substitution, and alternates ultimately are substituted, the defendant waives any challenge to such a procedure under Rule 24(c). **Naturally, though, the defendant does not necessarily waive all related objections. For example, as in the instant case, the defendant can still object to any jury instructions concerning the substitution, and if satisfactory procedures for substitution cannot be devised, he may certainly be permitted to withdraw his consent before it is too late. Here, however, [the defendant] did not attempt to retract his consent to substitution.**

*Id.* at 1109 (italics in original, bold emphasis added).

Returning to the case at bar, we conclude that Brockington's retraction of his consent to the alternate juror procedure

he agreed to at the conclusion of the trial was partially effective, at least as to the substitution of alternate jurors for regular jurors, and should not have been rejected by the trial court for the reasons it relied upon.[12] When Brockington announced, prior to any substitutions being made, that he was no longer consenting to the process that included substitutions, and instead was advancing a number of arguments, both general and specific, against substitution, the court did not consider any of those arguments, but instead determined that the substitutions were permitted by rule and case law. To the extent that that was a legal ruling, it was incorrect. To the extent that it was a ruling based upon the exercise of discretion, it was an abuse of discretion, because an exercise of discretion based upon an error of law is an abuse of discretion. *Alston v. Alston,* 331 Md. 496, 504, 629 A.2d 70 (1993). We explain.

Brockington's retraction (through counsel) of his consent to the jury deliberation procedure the court had recommended and implemented came after the alternate jurors had been retained and sent into the jury room with the regular jurors to observe the deliberations, but before the court decided whether to discharge any regular juror and substitute an alternate juror for a regular juror. By the time the retraction was announced, the court could not undo what already had occurred, that is, that the alternate jurors had not been discharged when the regular jurors retired to deliberate their verdict or that the alternate jurors had been present in the jury room for two days of deliberations. In that respect, the waiver retraction issue here is analogous to that in *Kaplan, supra,* in which the Fourth Circuit held that it was too late for a defendant to retract his waiver of the right to have certain factual issues decided by a jury when the court already had decided those very issues.

To be sure, when Brockington announced that he was retracting his consent, the alternate jurors could have been

---

**12.** Again, we proceed on the assumption that the requirements of Rule 2–512 may be waived.

removed from the jury room. Had that occurred, and had there been a plaintiff's verdict without any juror substitutions, Brockington nevertheless would be estopped to challenge on appeal the court's decision to retain the alternate jurors and allow them to observe the deliberations. The presence of the alternates in the jury room during deliberations was a *fait accompli* by the time Brockington retracted his consent.

However, when the retraction was announced, the court had not yet discharged any regular jurors and substituted them with alternate jurors. Although Brockington implicitly consented to a jury deliberation process that would have permitted such a substitution, he retracted his consent before any substitution took place, and therefore before the court or Grimstead could have taken any action, with respect to discharge and substitution, in reliance upon his consent. In addition, there could be no prejudicial consequences to Grimstead or the administration of the court by virtue of the retraction. Grimstead already had made it clear that she was opposed to the court's retaining the alternates beyond the time when the regular jurors retired to deliberate and therefore also was opposed to any substitution of an alternate juror for a regular juror during deliberations. The procedure she had wanted to follow would not have allowed for any substitutions, and the retraction would accomplish that. Indeed, other than the presence of the alternate jurors in the jury room during deliberations, retraction of the consent merely returned the deliberations to what they would have been, prior to the consent (and absent legal error on the court's part).

▪ Grimstead emphasizes in her argument that Brockington only retracted his waiver of the requirements of Rule 2–512 when he thought it would be to his benefit to do so, in a "cynical" effort to manipulate the jury deliberation process to his advantage. As the cases we have discussed hold, a party will not be permitted to retract a waiver or consent when doing so is merely a ploy to obtain a result that otherwise could not be accomplished, for example, manipulating the system to avoid trial by a properly selected but undesirable

jury, and to obtain trial by another jury. *See State v. Jones, supra,* 270 Md. at 396, 312 A.2d 281 (holding that defendant waived right to jury trial, made postponement requests, and retracted jury trial waiver in order to avoid being tried by a jury that was not to his liking but that was properly selected).

Although Brockington's retraction of his prior waiver was a change in position, it was not a ploy to accomplish what otherwise could not be obtained. The two are not necessarily the same. In this case, both parties changed their positions as the circumstances changed.[13] The trial lawyers representing the parties in this case all are experienced and highly competent practitioners, who were working smartly to attempt to achieve, within the bounds of the law, the best possible outcome for each of their clients. As in any case in which jurors, not the court, are the fact finders, the composition of the jury plays a critical role in the outcome. Lawyers on either side are advocates, and are duty bound to use their best efforts (again, within the bounds of the law) to select jurors whose thought processes will be most subject to their persuasion, for any number of legitimate reasons, including educational level, work history, and life experience. The advocates for the parties on both sides of this case attempted to do just that; and they cannot be faulted for zealous but ethical lawyering on behalf of their clients.

Retracting his consent to permit alternate jurors to be substituted for regular jurors during deliberations, at the time he did so, did not allow Brockington to accomplish anything he

---

**13.** Grimstead complains that Brockington only became concerned about the prospect of alternate jurors being substituted for deliberating regular jurors when it appeared that the regular jurors who he thought, because of their levels of education, would be more likely to decide the case based upon science, and would be less sympathetic to her, were in danger of being discharged and replaced by alternates. Yet, as Brockington points out, before the jurors retired to deliberate, Grimstead argued "vigorously" against alternate jurors being retained after the evidence was closed for any reason; later, when faced with the prospect of the court's dismissing the most educated regular juror (who also was the juror she had stricken in violation of *Batson,* and who had been seated as a regular juror to remedy that violation), Grimstead did not oppose substituting an alternate juror for a regular juror.

could not have accomplished had he not consented to begin with. He did not gain any unfair advantage by the retraction. This is not a situation in which the retraction of consent was for an ulterior improper purpose. Brockington was no more estopped to retract his consent to the jury deliberation process the court decided to employ, to the extent it had not yet been implemented, than Grimstead was estopped to waive her right to insist that the requirements of Rule 2–512, disallowing substitution of alternates for deliberating jurors, be followed.

For all of these reasons, assuming that the requirements of Rule 2–512 can be waived, Brockington's waiver was partially, and effectively, retracted with respect to the discharge of deliberating regular jurors and the substitution of alternate jurors. Accordingly, he is not precluded from challenging on appeal the substitution of alternate jurors for deliberating jurors.

### (d)

### *Legal Correctness Vel Non of Substitution of Alternate Jurors for Deliberating Regular Jurors*

The Court of Appeals decision in *Hayes* makes plain that, under Rule 4–312(b), substitution of an alternate juror for a regular juror is forbidden once the regular jurors have retired to deliberate by entering the jury room and closing the door. *See also James, supra,* 14 Md.App. at 698–99, 288 A.2d 644. As we have explained, the case at bar, being civil, not criminal, is governed by Rules 2–511 ("Trial by jury") and 2–512 ("Jury selection"), not by Rules 4–311 and 4–312 (which bear the same titles as their civil counterparts). Nevertheless, the operative language in the civil rules is identical to that in the criminal rules.

Indeed, in *Hayes,* the Court of Appeals pointed out that the standard in both Rule 2–512(b) and Rule 4–312(b) mandating discharge of the alternate jurors when the jury retires to consider its verdict is "the same for both civil and criminal cases. Md. Rule 2–512(b) allows a substitution 'before the time the jury retires to consider its verdict' and requires that

alternate jurors be discharged at that time." 355 Md. at 621 n. 1, 735 A.2d 1109.

Because neither Rule 4–312(b) nor Rule 2–512(b) contemplates that alternate jurors will be present after the regular jurors retire to consider their verdict, neither rule contemplates a circumstance in which the court has discretion to replace a deliberating juror with an alternate juror. As this Court observed many years ago in *James*, the Maryland Rules simply do not permit the substitution of an alternate juror for a regular juror after the jury has commenced deliberation. 14 Md.App. at 699, 288 A.2d 644. It was that circumstance that prompted the proposed rule changes that would have allowed alternate jurors to be retained after the regular jurors had retired to deliberate and further would have permitted the court to replace a deliberating juror with an alternate juror. (Even if the proposed amendments had been adopted, they would not have permitted the process employed here, in which alternates sat in on deliberations; rather, they would have required that alternates be kept separate and that, upon substitution, the newly reconstituted jury begin deliberations from the start.)

In the case at bar, the trial court's legal ruling that it had the authority, under Rule 2–512(b), to replace a deliberating juror with an alternate juror was incorrect; and the court erred, twice, in doing so.

Both *Hayes* and *Stokes* are unequivocal in holding that a presumptive prejudice standard applies when the sanctity of the jury room is breached by allowing alternates to attend or participate in deliberations. Here, both violations occurred. The theory behind such a standard is twofold. First, it avoids inquiry into the sanctified space of the jury room to determine what impact the presence of alternates had on the outcome of deliberations. Second, it recognizes the gestalt concept that, once a jury begins deliberating, it ceases to be six individual jurors and becomes a thing unto itself. To insert new members into the jury midstream cannot but have some impact on the deliberations. *Cf. Dep't of Human Res. v. Howard*, 397

Md. 353, 369 n. 18, 918 A.2d 441 (2007) (commenting that within appellate courts "the dynamics of conferencing and deciding a case is sometimes a delicate process influenced by the presence or absence of certain judges").

In the instant case, even under a prejudicial error standard, the impact of the substitution is clear. For more than 10 hours over the course of 2 days (with a three-day holiday weekend in the middle), the jury deliberated without reaching verdict. Twice during that period the foreperson informed the judge that the jurors were deadlocked three to three. Even under the proposed amendments to Rule 2–512, which the Court of Appeals rejected, substitution of an alternate juror mid-deliberations would have required an instruction by the court that deliberations were to begin anew. In the instant case, no such instruction was given. Three hours and 37 minutes after the substitution of the two alternates, the jury reached a verdict. The inference is strong, from the timing of events, that the change in the composition of the jury mid-deliberations caused a change in the outcome of the case, to Brockington's prejudice.

We understand the trial court's interest in averting a mistrial due to a hung jury after a long and complex trial. Any remedy to this problem, however, must comport with the Maryland Rules. One solution allowed by the Rules provides that civil parties may consent to accepting a verdict from less than six jurors. Brockington did not consent to this possibility in the instant case, as was his prerogative. The proposed amendments to the Rules provided another possible solution, but they were rejected by the Court of Appeals. Unless or until the Rules are changed by amendment or the legislature sees fit to intervene, alternate jurors may not participate in jury deliberations in any capacity, including by substitution.

The trial court committed legal error by substituting the alternate jurors for two regular jurors during deliberations. Under the presumptive prejudice standard set forth in Stokes, supra, the remedy for that error is reversal of the judgment and a new trial.

JUDGMENT REVERSED. CASE REMANDED TO THE CIRCUIT COURT FOR BALTIMORE CITY FOR FURTHER PROCEEDINGS. COSTS TO BE PAID BY THE APPELLEE.