10 A.3d 168

**Joyce GRIMSTEAD**

v.

**McNeal BROCKINGTON.**

**No. 130, Sept. Term, 2007.**

Court of Appeals of Maryland.

Dec. 17, 2010.

Benjamin Rosenberg (Andrew H. Baida of Rosenberg, Martin, Greenberg, LLP, Baltimore, MD; Gary A. Wais of Law Offices of Gary A. Wais, Owings Mills, MD), on brief, for petitioner/cross-respondent.

Jessica L. Ellsworth (Hogan & Hartson LLP, Washington, D.C.; Mark D. Gately of Hogan & Hartson LLP, Baltimore, MD), on brief, for respondent/cross-petitioner.

Argued before HARRELL, BATTAGLIA, GREENE, JOHN C. ELDRIDGE (Retired, Specially Assigned), LAWRENCE F. RODOWSKY (Retired, Specially Assigned), IRMA RAKER (Retired, Specially Assigned), and ALAN WILNER (Retired, Specially Assigned), JJ.

JOHN C. ELDRIDGE (Retired, Specially Assigned), J.

This is a medical malpractice action in which the plaintiff, Joyce Grimstead, was awarded $1,959,195, based on the failure of the defendant, Dr. McNeal Brockington, to correctly diagnose and treat her cancer. At the conclusion of the evidentiary portion of the trial, the judge instructed alternate jury members to attend the jury deliberations without participating. During jury deliberations, two of the original jury members were excused for medical reasons, and the trial judge substituted two alternates for the original jury members. The Court of Special Appeals reversed the judgment of the trial court, and remanded the case for a new trial, holding that the trial judge erred by having alternate jurors attend the jury deliberations and by substituting two alternate jurors for two original jurors. We shall affirm the decision of the Court of Special Appeals.

I.

The issues before us in this case are procedural, concerning the jurors at the trial and the substitution of a party during appellate proceedings. Consequently, we shall set forth the facts pertinent to those issues.

The case originated in the Circuit Court for Baltimore City as a medical malpractice action brought by Joyce Grimstead against Dr. McNeal Brockington. After a jury trial lasting six days, the jury found that Dr. Brockington negligently failed to diagnose and treat Ms. Grimstead for cancer of the retroperitoneum throughout a five-year period during which she was under his care. By the time another physician correctly diagnosed her condition, the cancer had progressed greatly, leaving Ms. Grimstead with a substantially shortened life expectancy.

The jury returned a verdict in favor of Ms. Grimstead, awarding her $4,414,195, which included $3,000,000 in noneconomic damages. The trial court reduced the noneconomic damages award to $545,000, limiting Ms. Grimstead's total judgment to $1,959,195.

Before the jury had been selected in this case, the trial judge had sought an agreement from the parties that, if necessary, they would accept a verdict from five jurors. Brockington's counsel declined to accept such a verdict, instead demanding a unanimous verdict from all six jurors.

As *voir dire* proceeded, the trial judge noted that Grimstead's lawyer had peremptorily challenged "the first five whites on the panel" and the judge stated that he was not "going to allow that." Grimstead's counsel then attempted to justify the exercise of each of his peremptory strikes, putting on the record his reason for each strike, but Brockington's counsel made a *Batson* challenge, arguing that Grimstead's counsel had given dubious justifications for his strikes.[1] In response to this argument, the judge found that one juror had been unjustifiably stricken but that the other strikes had been used lawfully. The judge stated

"With respect to Juror Number 263, I find plaintiff's reasons [for striking] have no merit whatsoever. \* \* \* [A]nd I also point out that two of the plaintiff's challenges were also two of the defendant's challenges—I am going to proceed with this case. As a matter of fact, three of the defense challenges and the plaintiff's challenges are of identical jurors.

"So with that, I'm going to proceed. I'll note your exception in light of the *Batson* matters and I will overrule them."

The judge then seated the jury except for juror number 263 who was excluded. Since it was the end of the day, the jury was released but not sworn. Once the jury had been excused, Brockington's counsel complained to the court as follows:

"Your Honor found that the strike by the plaintiff of juror number 263 was, in fact,—I think the term the court used was 'specious'—the explanation for the strike. My assumption was Your Honor was essentially going to overrule the

---

**1.** *See Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).

strike based upon that finding. And I noted that the court did not seat that juror, in effect sustaining the strike, the peremptory challenge by the plaintiff, which the court specifically found as a matter of fact to be specious.

"We would respectfully object to that and just emphasize for the record that that is inconsistent with the court's ruling, we believe."

The judge acknowledged that the "point is very well taken" but stated that he did not "like to seat a juror once that juror has been struck." At this point, Grimstead's counsel interjected:

"Your Honor, I just want to be clear. I have stated my reasons on the record. But given what [defense counsel] has just said, and given what you have said at the bench, Your Honor, to go through a trial like this and to have this hanging over our heads, to me, is a waste of judicial economy, if I may be blunt. I would request that we just get a new panel and start fresh and not have this appeal hanging over our heads."

The judge asked Brockington's counsel if he would waive any issues on appeal that had arisen during the jury selection, and Brockington's counsel stated that he was "certainly ... not in a position to waive any potential appellate issues at this time." The issue was not resolved, but the judge recessed stating his understanding that "[w]e will see where we are" the following morning.

The next day the judge informed the attorneys that he had asked one of his clerks to "grab" juror 263 before the juror left and instruct the juror to return the following day. The judge also informed counsel of his belief that there was a problem with another juror, alternate number one. The judge said that "alternate number one seems to have some real issues about what she really understands," and the judge noted that his clerk "had some real questions about what this woman really understood and comprehended." The judge then invited comment from the attorneys, noting that "we have options now" and that "if need be, [juror 263] would

become juror number four. And we could just move them, bump them all down." Grimstead's counsel again explained each of his peremptory strikes, stating that, "in regards to . . . juror number 263, I am not willing to accept him to come back onto this jury. I don't believe it's appropriate at this point." After both parties renewed their *Batson* arguments, the judge decided that "I'm going to have to seat this juror [number 263], in light of my factual findings." Over plaintiff's objections, juror number 263 was seated as juror number four, and the other jurors were moved sequentially down the list.

During the course of the trial, alternate juror number three and juror number one were excused for cause by the court. An alternate juror was substituted for juror number one. At the close of the evidence, six jurors and two alternates remained. The trial judge then instructed counsel as follows:

"THE COURT: I think tomorrow I am still going to have the two alternates just sit without participating in the discussion and if we need one, we [can substitute]. If we don't, so be it. If any of you have any vigorous objection to that, let me know now.

"PLAINTIFF'S COUNSEL: I have a vigorous objection, Your Honor.

"THE COURT: You do?

"PLAINTIFF'S COUNSEL: Yes.

"THE COURT: To sitting in, but not participating in the discussion?

"PLAINTIFF'S COUNSEL: Absolutely. Completely unnecessary. If [all the jurors] return tomorrow, [the alternates] should be dismissed.

"THE COURT: You know, I've had a medical malpractice case involving one of the [defense] attorneys here where the jury deliberated for five days, and I worry about situations like that in setting the stage. If you can come in with some authority tomorrow morning, I'll entertain it. I've done this in several other cases and no one's ever objected to having the [alternate] jurors sit in—my jury room is rather large—have the two alternates sit some-

where in the corner, just sit there and not participate in the discussion in the event that one of them was pressed into service. So we will see where we are [tomorrow]."

The following day the judge again raised the issue of the alternates sitting in the jury room while deliberations were ongoing, and explained:

"Counsel, at the conclusion of yesterday's session, I had indicated I thought it prudent, in light of past experiences, and to avoid potential risk of mistrial, to have the alternates sit in the jury room. My jury room is rather large; sit apart from the jury, and listen to the discussion; don't participate in the discussion, and I think this is a prudent way to proceed, in light of the fact that the Defendant will not go with less than five, and the Plaintiff will not accept the alternate in the panel itself. I think the prudent thing to do, particularly after a trial of this duration and complexity, where we can avoid a potential mistrial, is to have the alternates ready to step in, in the event something comes up. * * * So unless counsel has some authority to the contrary, this is what we are going to do, and I'm willing to entertain any discussion."

Plaintiff's counsel replied that he had not fully researched the issue, but he continued to object to the alternate jurors' presence during deliberations, saying:

"I'm just trying to be pragmatic about this, and I'm thinking how can [the alternate jurors] be sitting in a room, and not participate, and if they are deliberating for hours, they are going to certainly hear everything that is going on. So when you say, they are not participating, I think they are participating. They are hearing everything. They are going to be hearing debates. It's inevitable they are going to hear that. * * * But I understand the Court's concern. If the Court is going to insist that the alternates remain, I would object, and I would, at a minimum, ask that they be somehow, I don't want to use the word quarantined, but I'd rather them not be there, because it may be impossible to prevent them from participating, just, even if the Court just gives them instructions. Just like you told them not to

discuss the case, and they did, and I think hearing this and making faces, I don't see how they are going to divorce the process, even in a large room, they are hearing. I would feel more comfortable with them being somewhat separated."

In response, Brockington's counsel acknowledged that the judge had followed this procedure in another case which he had tried before this judge. Defense counsel stated that he "didn't object then" and that he did not "object now."

Over the plaintiff's objections, the judge sent the alternates into the jury room with the deliberating jury, explaining that "I have done this in many cases.... Actually, I never had an attorney object before.

"We don't have the physical facility to sequester the two alternates, but I don't know that I would want them sequestered, because as you have suggested ... they probably have to start deliberations all over if we had to substitute an alternate. But if they are there listening, but not participating in [the] discussion, then I don't see where there is any harm, in the event that one has to be substituted.

"My concern is because of the complexity of this case...."

Before the jury began their deliberations, the judge explained the role of the alternates to them as follows:

"The first six of you are the jury panel. The two in the back row are alternates. The six of you will participate in the discussion and try to resolve the issues that you have to decide. The two alternates will sit in the jury room, but you will sit apart from the jury. Sit on the sofa. You can listen in on the discussion, but you are not to participate.

"The reason I'm doing this is because if there is a problem, we have to have six jurors. And if we should unfortunately lose one of you for whatever reason, we will have an alternate. If we don't have six jurors, if we have the six of you deliberate and excuse the two alternates, if I should lose a juror, I'm going to have to declare a mistrial and have to start all over; that's what I don't want to occur.

"So the six will sit at the table and participate in the discussion, and the two alternates remain in the jury room, you will listen to discussion, but you are not to participate. And I can't emphasize that enough. I have done it in other cases; it's not been a problem. The two alternates are just to be in the jury room in the event an emergency should arise."

Plaintiff's counsel complained that the instructions had not referred to facial expressions or other participatory acts of the alternates, so the judge directed the alternate juror members as follows:

"[D]uring the discussions that you hear, I want you to remain as neutral as possible. You are not to make any facial expressions or body expressions whether you agree with something you hear or disagree with something you hear. You are not to reflect how you feel about anything. Just sit there and listen and remain as neutral as possible."

After nearly five hours of deliberations, the judge received two notes from the jury. One note indicated that "we are deadlocked at three and three." The other note, from alternate juror number two, requested that he be excused from jury duty unless he was needed to participate in deliberations. The trial judge told the attorneys that "I will not let this jury get out of here with one day of deliberations; that's the bottom line." Before the judge released the jury for the upcoming weekend, he cautioned them:

"The case you have just heard is a very complex case, and is a case that involves a lot of issues, and all of us appreciate that. You have deliberated about five hours. There have been cases that I have tried personally where I have had the jury deliberate up to five days. So because you have had one day of deliberations does not necessarily impress me. And I'm going to have you continue with your deliberations."

When the court reconvened the following Monday, the judge informed counsel of a letter he had received regarding juror number four, the original subject of the claimed *Batson* viola-

tion. Juror number four was the conductor of a musical group preparing to tour Asia. The juror's doctor had written to the judge, explaining that, in preparation for the trip to China, the juror was required to get immunization shots the following day. The doctor's letter also indicated that the doctor "was not aware that [the juror] had been selected for jury duty, and had I been notified in advance I would have strenuously objected. [The juror] should not expose himself to this type of stress because of his damaged heart." In response to this letter, counsel for Brockington contended that the juror should not be excused:

> "Your Honor, juror number four was a juror in whom we have had the greatest confidence because he seemed to be, from my observations, one of the most attentive jurors. He was taking notes the whole time. We feel it would be extremely prejudicial to the defense to have him stricken at this time."

Defense counsel continued:

> "[W]e think it would be extremely prejudicial to excuse this particular juror from [the] jury in the midst of their deliberations, especially when they're at this point, as the jury elected to inform us that they're divided three to three. I mean, it's particularly crucial that we not disturb the dynamics of the jury for either side."

Plaintiff's counsel took the opposite position, arguing that the juror should be excused and noting that

> "I think it's clear from the doctor's report it's an ongoing concern that's been present all along and probably mounting. This deliberation is going to get more heated, I believe. I don't think there's any prejudice."

Plaintiff's counsel also noted that "it may be better to get someone in to hopefully reach a unanimous verdict" and that "medical issues" like the ones presented by the juror's note were the "perfect reason" to utilize the alternates. The judge explained his concerns about excusing the juror, saying:

> "First of all, he was one of the initial jurors and that's something that weighs with me. Secondly, I'm not im-

pressed at all with his so-called stress. His stress is because he's worrying about this jury deliberation interfering with his trip. Anybody that has the kind of schedule this man has is not worrying about the stress of sitting down deciding a case like this. He's concerned about his personal activities being interfered with. So this letter really does not impress me that much...."

Defense counsel also pointed out that

"this was the same juror who ... was stricken by the plaintiff and who was reinstated based upon the *Batson* challenge and that's a further reason why I take respectful exception to [plaintiff's counsel's] interest at having him stricken at this point, recognizing that he does have issues."

The juror was brought into the courtroom, and the judge told him that he had given his doctor's letter "a great deal of consideration and we're going to see what happens by the end of the day and then we'll make some decisions."

The following day the jury sent another note indicating that the jurors could not reach a verdict, and the judge advised them, as he had before, that "this is a very serious case with complex matters that you have to resolve," which required them to "continue with [their] deliberation." At the end of that day, defense counsel moved for a mistrial on the ground that the jury deadlocked.

In addition to moving for a mistrial, defense counsel also revisited the issue of excusing juror number four, recalling again that juror number four was the subject of the earlier *Batson* challenge. Defense counsel argued that, "if juror number four is now removed from the jury, I think that destroys the remedy that the court had proposed ... and therefore we would renew our *Batson* challenge...."

Defense counsel also reversed his position on allowing alternates to attend the jury deliberations. He referenced, for the first time, this Court's opinion in *Stokes v. State,* 379 Md. 618, 843 A.2d 64 (2004). He quoted from a portion of the *Stokes* opinion as follows (379 Md. at 630–631, 843 A.2d at 71): "There can be no doubt that ... the judge erred by allowing

the alternates to attend any part of the jury deliberations." Counsel for Brockington continued

"[W]hile we did not object to the court permitting alternates to go to deliberate, at this point if the court is prepared to substitute juror number four with one of the alternates, we do object, and we no longer waive that objection. We make the objection that the alternates not be permitted to participate in the deliberations."

Defense Counsel also noted that, as a practical matter, if juror number four were excused, the attorneys could "talk with juror number four and find out ... [about] everything that's going on in the jury room." Such a possibility, he argued, would be "very intrusive to the jury function" and could interfere with the "great lengths to protect the sanctity of jury deliberations." Defense counsel concluded by reiterating that, "at this point I no longer waive my objection to the alternates being in the jury room and witnessing the deliberations." Counsel cited Maryland Rule 2–512(b), which at the time stated that "An alternate juror who does not replace a juror shall be discharged when the jury retires to consider its verdict."

In rebuttal, plaintiff's counsel argued that the defendant had "already waived" his objections to the process and that the defendant could not now revoke "his previous waiver when he was so adamant ... in wanting these alternates to be present."

After considering the arguments, the trial judge decided that the court had acted "in line with the *Stokes* decision," as the judge had been "very careful in telling the alternates not to participate in the discussion" and informing them that he "did not want them participating in the deliberation." Juror number four was called and told that, because of the doctor's note, "everyone agreed that we probably did have to let you go as of today." The juror was also informed as follows:

"Under Maryland law, you are free to talk about the case now since you're no longer a juror because I am excusing you. However, if any of these attorneys try to talk to you

and if you tell them you don't want to talk to them, they will not persist."

After excusing juror number four, the judge acknowledged that he had received a note from juror number six, complaining that she would not be paid by her employer if she continued with jury service. The judge decided not to excuse her, but defense counsel complained that he did not "understand how this juror is any different than juror number four."

When the court reconvened the following day, juror number five brought in a doctor's note, and the judge also excused him. Defense counsel renewed his objection to "substituting any members of the jury with alternates," again citing *Stokes*. Defense counsel objected to the court removing "the most educated jurors on this panel" while the "jury was deadlocked three to three." He continued:

"I obviously don't know how they're voting, who's voting which way, but I would tend to think because of the tremendous sympathy in this case that it favors me to have the most educated jurors on the panel."

Defense counsel also pointed out that the juror number six had indicated that she could not continue her jury service, and the judge had decided to keep her on the jury. Defense counsel stated that he did not

"waive any of my objection to the process, and I think the *Stokes* case is directly on point, and, under the circumstances, it's improper at this point to let the alternates now start deliberating once the other members of the jury were no longer able to deliberate, and I do not, I am not willing to go with less than the six original jurors who were asked to deliberate, so I object, your honor."

The trial judge pointed out that jurors number four and five had been excused due to medical reasons while juror number six presented a financial reason, which the judge found was distinguishable. Regarding the participation of the alternates in the deliberations, the judge stated:

"Now I want to make this record clear. I told [the alternates] not to participate in deliberation, not to discuss

it, just sit there and listen in the event that they were needed. One of the [alternate] jurors even sent out a note to that effect indicating that he had just sat and listened and done nothing, and he had not participated, so they seem to have followed my instructions quite clearly. And as I have pointed out, this is probably the best jury I have ever seen, all of them. They are early everyday, I mean, this is one of the best juries I have ever had the pleasure and honor of working with. So, your motion is denied."

The judge later received a note from the jury requesting clarification of one of his instructions. In discussing how to respond to the jury's question, defense counsel again repeated his objection, stating:

"I don't want to miss an opportunity to object to this process. I object to the dismissal of [juror numbers four and five] from the jury, the regular jurors. I object to the substitution of the alternates in place of the regular jurors. I also refer the court to another case, *Hayes v. State,* 355 Md. 615, [735 A.2d 1109] a 1999 case out of Baltimore County where the Court held that an alternate juror can not be substituted for a regular juror after the jury has begun deliberations."

The judge pointed out that defense counsel had not earlier "object[ed] to the alternates going in" to the jury room. The judge answered the jury's question and then recessed for lunch.

Shortly after lunch, the jury returned with a verdict. The jury found for Ms. Grimstead and awarded her $500,000 for past medical expenses, $67,000 for loss of past earnings, $847,195 for loss of future earnings, $1 million for non-economic damages and $2 million for future non-economic damages. The judge reduced the jury's non-economic damages award to $545,000, and a judgment for $1,959,195 was entered in favor of Ms. Grimstead.

Both Brockington and Grimstead noted appeals to the Court of Special Appeals. Brockington sought review of the trial court's decision to allow "two alternate jurors to attend jury

deliberations" and the subsequent substitution of the alternates for two regular jurors. Grimstead sought review of the reduction of the jury's non-economic damages award. The Court of Special Appeals agreed with Brockington's argument, holding that the Circuit Court erred when it allowed two alternate jurors to be present in the jury room during deliberations. The intermediate appellate Court reversed and remanded the case for a new trial. *Brockington v. Grimstead,* 176 Md.App. 327, 933 A.2d 426 (2007). Because of this disposition, Grimstead's question regarding the reduction of the jury award was not addressed. Ms. Grimstead died before the Court of Special Appeals filed its opinion.

With regard to the presence of alternate jurors in the jury room during deliberations, and the substitution of alternate jurors for regular jurors during deliberations, the Court of Special Appeals "proceed[ed] on the assumption that the requirements of Rule 2–512 may be waived." 176 Md.App. at 359, n. 12, 933 A.2d at 444, n. 12. The appellate court concluded that "Brockington's retraction of his consent to the alternate juror procedure [which] he agreed to ... was partially effective, at least as to the substitution of alternate jurors for regular jurors, and should not have been rejected by the trial court for the reasons it relied upon." 176 Md.App. at 358–359, 933 A.2d at 444. In considering the "legal correctness *vel non* of substitution of alternate jurors for deliberating regular jurors," however, the Court of Special Appeals determined that prior Court of Appeals decisions mandate that, in criminal trials, "substitution of an alternate juror for a regular juror is forbidden once the regular jurors have retired to deliberate by entering the jury room and closing the door." 176 Md.App. at 362, 933 A.2d at 446. While this was not a criminal case, nevertheless the Court of Special Appeals held that "the trial court's legal ruling that it had the authority, under Rule 2–512(b), to replace a deliberating juror with an alternate juror was incorrect." 176 Md.App. at 363, 933 A.2d at 446.

A petition for a writ of certiorari was filed in this Court on behalf of the plaintiff, presenting the following questions:

"1. Did the trial court commit reversible error under Maryland Rule 2–512(b) by allowing two alternate jurors to attend jury deliberations in a civil case and substituting the alternates for two regular jurors during deliberations, when the defendant expressly agreed to the alternates' presence during the deliberations and attempted to withdraw his consent only when the trial court designated the alternates to replace regular jurors whom the defendant preferred?

"2. Does the statutory limitation on non-economic damages set forth in § 11–108(b)(2) of the Courts and Judicial Proceedings Article [of the Maryland Code] increase when a physician commits repeated acts of negligence in successive years while treating a patient?"

The certiorari petition also pointed out that "Ms. Grimstead died while this case was pending before the Court of Special Appeals. The proper party will be substituted for Ms. Grimstead once her estate is opened." A conditional cross-petition for a writ of certiorari was filed by the defendant, presenting the following question:

"[W]hether the prohibitions in Maryland Rule 2–512(b) are waivable rights, as the Court of Special Appeals assumed, or whether (1) the presence of alternate jurors in the jury room during deliberations is a non-waivable right and (2) a mid-deliberation juror substitution in the absence of any instruction to begin deliberations anew is a non-waivable right."

This Court granted both the petition and the cross-petition, *Grimstead v. Brockington*, 403 Md. 304, 941 A.2d 1104 (2008).

Subsequently, Brockington filed a motion to dismiss the writ of certiorari. In the motion, Brockington argued that, because Ms. Grimstead died prior to the date when the Court of Special Appeals filed its decision, and because no personal representative had been selected when the petition for certiorari had been filed, her petition was a "nullity" that should not have been granted. The motion to dismiss was the first time that counsel for Brockington made this argument, as the issue was not raised in Brockington's opposition to Grimstead's

petition for a writ of certiorari, in Brockington's conditional cross-petition, or in Brockington's brief on the merits.

## II.

■ We first address Brockington's motion to dismiss the writ of certiorari. Maryland Rule 8–401(b) establishes the proper procedure for substitution before the appellate courts:

"(b) **Substitution.** The proper person may be substituted for a party on appeal in accordance with Rule 2–241."

Maryland Rule 2–241 specifies as follows:

"**Rule 2–241. Substitution of parties.**

(a) **Substitution.** The proper person may be substituted for a party who:

(1) dies, if the action survives....

\* \* \*

(b) **Procedure.** Any party to the action, any other person affected by the action, the successors or representatives of the party, or the court may file a notice in the action substituting the proper person as a party. The notice shall set forth the reasons for the substitution and, in the case of death, the decedent's representatives, domicile, and date and place of death if known. The notice shall be served on all parties in accordance with Rule 1–321 and on the substituted party in the manner provided by Rule 2–121, unless the substituted party has previously submitted to the jurisdiction of the court.

(c) **Objection.** Within 15 days after the service of the notice of substitution, a motion to strike the substitution may be filed.

(d) **Failure to substitute.** If substitution is not made as provided in this Rule, the court may dismiss the action, continue the trial or hearing, or take such other action as justice may require."

In *Surland v. State,* 392 Md. 17, 30, 895 A.2d 1034, 1042 (2006), this Court noted that Maryland Rule 1–203(d) complements both Rule 2–241 and the rule applicable in criminal

cases by "automatically suspending all time requirements applicable to the deceased party from the date of death to the earlier of sixty days after death or fifteen days after the appointment of a personal representative by a court of competent jurisdiction." [2] Moreover, Rule 1–203(d) provides that, "[b]efore or after the expiration of an extension period under this section," a proper substitution may still be made "upon a showing of good cause" why a proper substitution was not previously made and showing that "a further extension will not unfairly prejudice the rights of any other party."

As counsel for Grimstead points out, "Ms. Grimstead died one week before the Court of Special Appeals issued its mandate on November 6, 2007, and just three weeks before the Petition for Certiorari was required to be filed in accordance with Rule 8–302(a)." Once her estate was opened and Arthur V. Grimstead was appointed as her personal representative, he was substituted in the case.[3]

While, under the time requirements of Rule 1–203(d), counsel for Grimstead should have proceeded more expeditiously, counsel for Brockington failed to raise any objection to Grimstead's certiorari petition until after a personal representative had been appointed and on the same day that he was substituted. Brockington has not alleged that the delay in a substi-

---

**2.** Rule 1–203(d) in its entirety states as follows:

"(d) **Extension of time requirements upon the death of a party.** Upon the death of a party, all time requirements under these rules applicable to that party shall be extended automatically from the date of death to the earlier of (1) 60 days after the date of death or (2) 15 days from the issuance of letters of administration by a court of competent jurisdiction. Before or after the expiration of an extension period under this section and upon a showing of good cause why a proper substitution was not made or could not have been made prior to the expiration of the extension and that a further extension will not unfairly prejudice the rights of any other party, the court may extend the time requirements applicable to the deceased party for an additional period commencing upon the expiration of the extension."

**3.** Arthur V. Grimstead was appointed personal representative on April 14, 2008, and was substituted as petitioner in this case on May 29, 2008. The motion to dismiss the certiorari petition was also filed in this court on May 29, 2008.

tution of a personal representative "unfairly prejudice[d]" [4] his rights during the pendency of this appeal.

Brockington, however, argues that this Court's decision in *Brantley v. Fallston General Hospital, Inc.*, 333 Md. 507, 636 A.2d 444 (1994), "is directly on point" and controls the present case. In *Brantley,* the plaintiff died before the Circuit Court rendered a judgment. Once the Circuit Court's judgment was entered, counsel for the deceased client noted an appeal to the Court of Special Appeals before a personal representative had been named. Because "[c]ounsel did not purport to represent a specific successor in interest at the time he noted an appeal," this Court directed the Court of Special Appeals to dismiss the appeal. *Brantley,* 333 Md. at 515, 636 A.2d at 448. The *Brantley* case is quite distinguishable from the case at bar. In the present case, unlike the situation in *Brantley,* the initial notice of appeal in this case was filed while Joyce Grimstead was still living. Joyce Grimstead had consented to an appeal of the trial court's decision, and her attorney was following her wishes by continuing the appellate proceedings, *i.e.,* by petitioning this Court for a writ of certiorari.

Under Rule 2–241(d), we have discretion to "take such . . . action as justice may require." In light of the circumstances of this case, we shall deny the motion to dismiss.[5]

### III.

We now turn to the issues concerning the alternate jurors.

---

**4.** Rule 1–203(d).

**5.** It should also be noted that it makes little practical difference whether the motion to dismiss is granted or denied. The Court of Special Appeals in this case reversed the judgment of the Circuit Court and remanded the case for a new trial. As stated in the first paragraph of this opinion, we shall, on the merits, affirm the decision of the Court of Special Appeals. If, however, we were to grant the motion to dismiss, the result would be the same. A dismissal of the writ of certiorari would simply leave in effect the judgment of the Court of Special Appeals. In either event, the trial court's judgment would be reversed, and the case would be remanded for a new trial.

### A.

 Preliminarily, Grimstead argues that Brockington's consent to the alternates' presence in the jury room effectively waived any objections later made by Brockington to the procedure used to substitute alternate jurors for the regular jurors. According to Grimstead, Brockington had fully waived his rights to the alternates' participation in deliberations, and his waiver could not be retracted.

On the other hand, Brockington argues that the presence of alternate jurors during deliberations, and the substitution of alternate jurors for regular jurors after deliberations began, are "fundamental errors requiring reversal without inquiry into whether or when an objection was raised below" and "irrespective of . . . waiver." (Brief for respondent/cross-petitioner at 36–38). Alternatively, Brockington contends that he did not waive the "mid-deliberation substitutions" (*id.* at 25), and that, therefore, the Court of Special Appeals correctly reversed and remanded the case for a new trial. Brockington points out that the trial court committed several errors of law when it failed to discharge the alternate jurors upon the start of deliberations, when it allowed alternate jurors to attend the deliberations, and when it substituted alternates for original jury members after deliberations had commenced. Brockington submits that he did not waive his objection on the issue of substitution because, at the time of substitution, he made a timely objection which had not been waived by his earlier consent to the alternates' presence during deliberations.

In *Stokes v. State*, 379 Md. 618, 843 A.2d 64 (2004), this Court, in an opinion by Judge Raker, cited numerous out-of-state cases holding that waiver is inapplicable to the presence of alternates during jury deliberations. Nevertheless, we noted that "[t]he issue of preservation for appellate review or waiver is not an issue in the case *sub judice* because appellant objected to the presence of alternate jurors in the jury room." *Stokes*, 379 Md. at 639 n. 10, 843 A.2d at 76 n. 10.

Similarly, in the present case, we need not decide whether the presence of alternate jurors during jury deliberations, and

the substitution of alternates for regular jurors after deliberations had begun, are issues which can be waived. As the Court of Special Appeals correctly held, the presence of alternates during jury deliberations, and the substitution of alternates for regular jurors after deliberations have begun, are separate and distinct issues. Although Brockington's counsel did not object to the alternate jurors being present during deliberations, he consistently objected to the mid-deliberation substitution of alternate jurors for regular jurors. Moreover, as discussed in Part B below, the trial judge's substitution of alternates for regular jurors after deliberations had begun was clearly error and was presumptively prejudicial. Consequently, even if we assume, *arguendo*, that principles of waiver are applicable, Brockington did not waive his objection to the mid-deliberation substitution of alternate jurors for regular jurors.

### B.

When this case was before both the Circuit Court and the Court of Special Appeals, former Maryland Rule 2–512(b) provided as follows with respect to alternate jurors (emphasis added):

"(b) **Alternate jurors.** The court may direct that one or more jurors be called and impanelled to sit as alternate jurors. Any juror who, before the time the jury retires to consider its verdict, becomes or is found to be unable or disqualified to perform a juror's duty shall be replaced by an alternate juror in the order of selection. An alternate juror shall be drawn in the same manner, have the same qualifications, be subject to the same examination, take the same oath, and have the same functions, powers, facilities, and privileges as a juror. *An alternate juror who does not replace a juror shall be discharged when the jury retires to consider its verdict.*"

Effective January 1, 2008, the above-quoted provision was recodified without substantive change as Rule 2–512(f), which reads as follows (emphasis added).

"(f) **Impanelled jury.** (1) Impanelling. The individuals to be impanelled as sworn jurors, including any alternates, shall be called from the qualified jurors remaining on the jury list in the order previously designated by the trial judge and shall be sworn.

(2) Oath; functions, powers, facilities, and privileges. All sworn jurors, including any alternates, shall take the same oath and, until discharged from jury service, have the same functions, powers, facilities, and privileges.

(3) Discharge of jury member. At any time before the jury retires to consider its verdict, the trial judge may replace any jury member whom the trial judge finds to be unable or disqualified to perform jury service with an alternate in the order of selection set under subsection (e)(1). *When the jury retires to consider its verdict, the trial judge shall discharge any remaining alternates who did not replace another jury member.*"

The critical language, applicable to the present case, is that alternate jurors who did not replace regular jurors must be discharged when the jury retires to consider its verdict. Such alternate jurors neither can be present at deliberations after the jury retires nor can be substituted for regular jurors after the jury retires.

The above-quoted rules are applicable to civil cases. Nevertheless, Rule 4–312(f), applicable to criminal cases, contains identical language. Rule 4–312(f) states as follows (emphasis added):

"(f) **Impanelled jury.** (1) Impanelling. The individuals to be impanelled as sworn jurors, including any alternates, shall be called from the qualified jurors remaining on the jury list in the order previously designated by the trial judge and shall be sworn.

(2) Oath; functions, powers, facilities, and privileges. All sworn jurors, including any alternates, shall be called from the qualified jurors remaining on the jury list in the order previously designated by the trial judge and shall be sworn.

(3) Discharge of jury member. At any time before the jury retires to consider its verdict, the trial judge may replace any jury member whom the trial judge finds to be unable or disqualified to perform jury service with an alternate in the order of selection set under section (e). *When the jury retires to consider its verdict, the trial jury shall discharge any remaining alternates who did not replace another jury member."*

While this Court has not previously addressed the issues in this case in the context of a civil case, we have addressed the issues in two criminal cases, *Hayes v. State*, 355 Md. 615, 735 A.2d 1109 (1999), and *Stokes v. State, supra*, 379 Md. 618, 843 A.2d 64. Because the words of the civil and criminal rules are identical, and because there is a Maryland constitutional right to a jury trial in civil as well as in criminal cases, the *Hayes* and *Stokes* opinions are direct authority in civil as well as in criminal cases. In fact, we stated in *Hayes*, 355 Md. at 621 n. 1, 735 A.2d at 1112, n. 1, that "[t]he standard is now the same for both civil and criminal cases."

In *Hayes v. State, supra*, 355 Md. at 623, 621, 735 A.2d at 1113, 1112, this Court considered the issue of "mid-deliberation substitutions" with particular focus on the precise moment deliberations commence and the meaning of the phrase "when the jury retires to consider its verdict." One of the original jury members became ill in the *Hayes* case after the jury had left the courtroom. The trial judge made a finding that the juror's illness occurred before deliberations had commenced, recalled a previously discharged alternate juror, and substituted the alternate juror for the ill juror. Defense counsel objected to the substitution, arguing that the jury had already retired to deliberate and that alternates could not be substituted after that time. The trial court made a factual finding that deliberations had not yet begun and allowed the alternate to deliberate. Shortly thereafter, the jury returned a conviction. The *Hayes* Court reversed that conviction, holding that the judge had erred in making the substitution after the jurors had entered the jury room and closed the door behind them.

Five years after *Hayes,* this Court decided *Stokes v. State, supra,* 379 Md. 618, 843 A.2d 64, which directly addressed the consequences of alternate jurors' presence in the jury room during deliberations. This Court in *Stokes* flatly held that "the trial court erred in sending the alternate jurors into the jury room to deliberate...." 379 Md. at 629, 843 A.2d at 70. The trial in *Stokes* involved numerous counts, and it was conducted pursuant to Rule 4–314, entitled "Defense of not criminally responsible." If a defendant pleads not criminally responsible, the rule permits a bifurcated trial on the separate issues of guilt and criminal responsibility. Rule 4–314(b)(4) requires that "at least two alternate jurors, who shall be retained throughout the trial" be selected, and subsection (b)(1) states that the trial is a "single continuous trial in two stages." If the jury returns a verdict of guilty, that same jury proceeds to determine criminal responsibility.

Sixteen jury members were selected in *Stokes,* but at the conclusion of the guilt/innocence phase of the trial, the judge notified the jury that "at the present time, you are all jurors. You are not both jurors and alternates, even though we so designated you." *Stokes,* 379 Md. at 623, 843 A.2d at 66. The jurors were also told that the verdict had to be unanimous and that they should "[m]ake sure that all sixteen of you agree with the verdict." 379 Md. at 623, 843 A.2d at 67. Although defense counsel objected to the inclusion of the alternate jurors in the deliberations, the judge allowed the alternates to participate in the deliberations. After several hours of deliberations, the court received a note from the jury inquiring, "Do alternates count?" 379 Md. at 623, 843 A.2d at 67. After some research and argument, the trial judge changed his interpretation of the rule and re-instructed the alternate jurors to act "as observers so that they'll know what went on for the next phase of the case." 379 Md. at 624, 843 A.2d at 67. After receiving that instruction, the alternates again joined the regular jurors in the jury room for deliberations, despite the reiteration of defense counsel's objections. The jury then returned several not guilty verdicts, but also returned guilty verdicts on three charges. The defendant entered into a plea

agreement with the State on the issue of criminal responsibility. After the defendant was sentenced, however, he appealed his conviction and this Court granted certiorari.

This Court noted in *Stokes* that, "under Maryland law ... an alternate juror may not be substituted" after jury deliberations have begun because "[t]he deliberations of the regular jurors are of no concern to the alternates." 379 Md. at 630, 843 A.2d at 71. The Court also explained that, "Unlike several other states, Maryland permits the substitution of an alternate juror only before the jury begins to deliberate on the case, and not after deliberations have commenced." 379 Md. at 629–630, n. 5, 843 A.2d at 70, n. 5. The Court stressed the point that "if, after deliberations have commenced, a regular juror becomes unable to complete the deliberations, under Maryland law ... an alternate juror may not be substituted." 379 Md. at 630, 843 A.2d at 71. Accordingly, the *Stokes* Court held that the trial court had erred by allowing the alternate jurors "into the jury room to deliberate." 379 Md. at 629, 843 A.2d at 70.

Central to the *Stokes* Court's determination was the sanctity of the jury room once deliberations have commenced. The Court emphasized that Maryland "jurisprudence related to a jury trial has zealously guarded against intrusions into the jury room and jury deliberations." 379 Md. at 633, 843 A.2d at 72. The Court also disapproved of the alternates' presence during deliberations because of "the lack of accountability." 379 Md. at 634, 843 A.2d at 73. Alternate jurors could influence deliberations without "the ultimate and weighty responsibility to decide the case." 379 Md. at 634, 843 A.2d at 73. The Court noted that it would be nearly impossible to ascertain what had occurred in the jury room because "inquir[ing] into jury motives is, to a large degree, proscribed by [the rules]." *Stokes*, 379 Md. at 635, 843 A.2d at 74 (internal quotes omitted). The Court acknowledged that, "[a]lthough almost every court that has considered the issue of the presence of an alternate juror during deliberations has found it to be error, courts are not uniform as to the remedy." 379 Md. at 634, 843 A.2d at 73. This Court, however, applied the

presumptive prejudice standard, explaining (379 Md. at 638, 843 A.2d at 75–76):

"We consider the presence of alternate jurors during the jury deliberations as sufficiently impinging upon the defendant's constitutional right to a jury trial as guaranteed by the Maryland Constitution and Maryland Rules of Procedure to create a presumption of prejudice. Jury deliberations are private and are to be conducted in secret.... * * * The presence of alternate jurors who have no legal standing as jurors injects an improper outside influence on jury deliberations and impairs the integrity of the jury trial. Prejudice must be presumed where alternates breach the sanctity of the jury room."

In light of this Court's opinions in *Hayes* and *Stokes,* and the unambiguous language of the Maryland rules, it is clear that the Court of Special Appeals correctly reversed the judgment of the Circuit Court and remanded the case for a new trial.[6]

*JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED. COSTS IN THIS COURT AND IN THE COURT OF SPECIAL APPEALS TO BE PAID BY THE PETITIONER AND CROSS–RESPONDENT.*

HARRELL, RODOWSKY and RAKER, JJ., dissent.

RAKER, J. dissenting, joined by HARRELL and RODOWSKY, JJ.

I respectfully dissent. I would reverse the Court of Special Appeals and affirm the judgments of the Circuit Court for Baltimore City. I would hold that, under the particular circumstances of this case, the Circuit Court did not err by allowing two alternate jurors to be present during jury deliberations in this civil case (after being instructed by the court, in clear language not to participate in jury deliberations, but rather to sit mutely in a corner and pay attention to the course of

---

6. Our disposition of the case makes it unnecessary to reach the second issue in Grimstead's certiorari petition.

deliberations) and by substituting the alternates for two regular jurors who were excused during the deliberations, after respondent agreed expressly to the alternates' presence during jury deliberations, but who attempted later to withdraw his consent to the procedure only when the trial court, for cause, designated the alternates to replace regular jurors who could not continue but whom he preferred. Thus, this is really a matter of waiver.

There is very little, if any, dispute, as to the relevant facts. Dr. Brockington agreed to the trial court's intended procedure. In response to the court's inquiry, respondent's counsel replied as follows:

"Your Honor, I think the last trial, which finished two weeks ago, we did the same thing. Your Honor suggested. I didn't object them. I don't object now."

Dr. Brockington had no objection to the alternate jurors sitting in the deliberations, and at least implicitly, deliberating if necessary.

The presence of alternates during jury deliberations and the substitution of those alternates for regular jurors after deliberations have begun are not always and necessarily two separate and distinct issues. *See* Maj. op. at 352–53. It was clear to all counsel and parties that the judge permitted the alternates to be in the jury room to insure that there would be a sufficient number of jurors to enable the jury to reach a verdict in the event any of the original jurors could not continue their service. The judge clearly was not engaging in a "feel good" or reward gesture for alternate jurors' having sat through the entire trial. Everyone in the courtroom understood the goal of permitting the alternates in the jury room.

The majority opinion sees two separate issues here—one, the presence of alternates during the jury deliberations, and two, the substitution of those alternates for regular jurors after deliberations have begun. It may well be that there can be separate issues, under certain circumstances, such as when an appellate court is considering whether reversal is required

when an unauthorized alternate juror is in the jury room, but the jury had not yet begun to deliberate. But here, it is a single issue. Everyone in the courtroom understood the judge's intention, and respondent agreed to the procedure without expressing any reservations or limitations.

Although the procedure employed by the trial court is not provided for in the Maryland Rules, the fact that it is not provided for explicitly, or even that the Rule is silent as to the procedure, does not mean that the parties and the court cannot agree to a different procedure than is provided for in the Rule. The majority says that the provisions of Rule 2–512(b) cannot be waived. In the context of preservation for appellate review, the majority is correct; failure to object at the trial level to the presence of alternate jurors in the jury room during deliberations ordinarily will not be considered to have waived the issue on appeal. But the cases referred to by the majority for the waiver of appellate review do not stand for the proposition that a party cannot agree to a procedure that differs from the Rule.

Particularly egregious here is the fact that respondent agreed to the alternates sitting in the jury room, and participating if necessary, and only attempted to withdraw his consent when it became apparent that he was losing jurors that he considered favorable to his side. A party cannot acquiesce or agree to a procedure and then complain about the ruling when things appear to turn to his disadvantage. *See Smith v. Gulf Oil Co.*, 995 F.2d 638, 645–46 (6th Cir.1993) (holding that, although the trial court violated Federal Rule 47(b), waiver principles apply in the alternate juror context); *cf. United States v. Cencer,* 90 F.3d 1103, 1109 (6th Cir.1996) (holding that a defendant waives his right to object to a post-submission substitution of an alternate juror when he voluntarily agreed to the procedure); *United States v. Guevara,* 823 F.2d 446, 448 (11th Cir.1987) (holding that "[w]here the defendant knowingly consents to the addition of an alternate juror, as was obviously the case here, he waives any challenge to that procedure on appeal.").

Affirming the trial court in this case does not undermine *Hayes v. State,* 355 Md. 615, 735 A.2d 1109 (1999), and *Stokes v. State,* 379 Md. 618, 843 A.2d 64 (2004). Those cases remain good law. It is just here, respondent agreed to the procedure, and by doing so, waived any objection to it.

I would hold that deviation from the requirements of Maryland Rule 2–512 is waivable and that respondent waived any objection to a deviation from the Rule by agreeing at the trial level to the procedure suggested by the trial judge.

I am authorized to state that Judge GLENN HARRELL and Judge LAWRENCE RODOWSKY join in the views expressed in this dissenting opinion.