*Bryant Bennett v. State of Maryland*
No. 1756, September Term 2019. Opinion by Wells, J.

**CRIMINAL LAW – *BATSON* – THREE-STEP ANALYSIS**
When a court evaluates a *Batson* challenge it must undertake a three-step analysis. First, the party challenging the strike must make a *prima facie* showing that the strike was made on a constitutionally prohibited basis. Second, the striking party must provide an explanation for the strike that is neutral as to race, gender, and ethnicity. Third, the court must decide whether the challenging party has proved purposeful racial discrimination.

**CRIMINAL LAW – *BATSON* – PRIMA FACIE SHOWING**
To make a prima facie showing under *Batson*, the party challenging the strike must produce some evidence that the striking party's use of a peremptory challenge was exercised on one or more of the constitutionally prohibited bases. The threshold for a prima facie showing is not as high as a prima facie case. A prima facie showing is established if the challenging party can show that the totality of the relevant facts gives rise to an inference of discriminatory purpose.

**CRIMINAL LAW – *BATSON* – STANDARD**
Under *Batson*, a party must prove by a preponderance of the evidence that a peremptory strike was exercised in a way that shifts the burden of production to the striking party and requires it to respond to the rebuttable presumption of purposeful discrimination that arises under certain circumstances.

**CRIMINAL LAW – *BATSON* – DISCRIMINATORY MOTIVE**
In determining whether a striking party had a discriminatory motive, courts must also assess whether the striking party acted consistently; that is, whether jurors that do not belong to the class at the basis of the *Batson* challenge (race, gender, or ethnicity) but that are otherwise similarly situated to the stricken juror, were also struck on identical or comparative grounds. Here, the trial court did not look to the attendant circumstances in evaluating whether the State provided a valid race-neutral reason for striking the sole Black prospective juror but seating two similarly situated White prospective jurors.

**CRIMINAL PROCEDURE – BILL OF PARTICULARS – WAIVER**
A party who validly waives a right may not complain on appeal that the court erred in denying him the right he waived. Appellants may not take advantage of an obscurely situate, undecided motion and stand mute in the face of repeated requests by the judge for all pending motions to be decided.  In this case, after filing a demand for a bill of particulars, at a motions hearing, Bennett's counsel told the court that he was "withdrawing all motions," except a motion to compel.  At the hearing on the motion to compel, held two weeks later, defense counsel did not ask the court to address the bill of particulars. Later, Bennett's counsel asked the court to consider his request for a bill of particulars.  The trial

court properly found that Bennett had waived the demand for particulars at the first motions hearing.

Circuit Court for Cecil County
Case No. C07-CR-19-000379

REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 1756

September Term, 2019

_____

BRYAN BENNETT

v.

STATE OF MARYALND

_____

Arthur,
Wells,
Woodward, Patrick L.,
  (Senior Judge, Specially Assigned)

JJ.

_____

Opinion by Wells, J.

_____

Filed:  September 10, 2021

Pursuant to Maryland Uniform Electronic Legal
Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Suzanne C. Johnson, Clerk

A jury empaneled in the Circuit Court for Cecil County convicted Bryan Bennett, appellant, of second-degree assault, conspiracy to commit robbery, conspiracy to commit second-degree assault, and conspiracy to commit theft. The circuit court sentenced Bennett to four years' imprisonment for the assault conviction, and to a concurrent term of four years for the conspiracy to commit robbery conviction. Based on principles of merger and lenity, the court did not impose sentences on the remaining convictions. On appeal, Mr. Bennett presents the following questions for our review:

1. Did the trial court err when it denied defense counsel's *Batson*[1] challenge?

2. Did the trial court commit reversible error when it refused to require the State to provide a bill of particulars?

We conclude that the trial court erred when it denied defense counsel's *Batson* challenge; therefore, we reverse the trial court's decision as to question one, vacate the convictions, and return the case to the circuit court for a new trial. As to question two, we affirm.

## BACKGROUND

On February 12, 2019, J.S.,[2] a thirteen-year-old[3] boy, used Snapchat to exchange messages with a person identified as the "Elkton Weed Man" ("the seller"). The seller

---

[1] *Batson v. Kentucky*, 476 U.S. 79 (1986).

[2] Because the victim and the co-defendant are minors, we referred to them by their initials.

[3] We note that Trooper John Wildman testified that J.S.'s date of birth was August 4, 2005, and that J.S. was fourteen at the time of the robbery on February 12, 2019. Assuming J.S.'s date of birth was August 4, 2005, he would have been thirteen years-old

asked J.S. if he wanted to purchase marijuana and J.S. responded that he did. J.S. and the seller agreed to meet at J.S.'s house, where J.S. would give the seller an iPhone 5s in exchange for a vape pen containing liquid THC, a marijuana derivative. According to J.S., he informed the seller that the iPhone 5s was in working condition, but that the phone's charging port needed to be repaired.

Later that same day, the seller notified J.S. that he had arrived at J.S.'s house. J.S. entered the backseat of a waiting Honda sedan and sat next to a White male, who was approximately fourteen to sixteen-years old, wearing a hoodie. J.S. described the driver as a tall Black male with short hair and a beard, wearing a black bandana and a gray hoodie. He described the front seat passenger as a Black male, approximately eighteen years old, with dreadlocks, wearing a black bandana, black hoodie, and black jeans.

According to J.S., the driver drove a short distance before stopping the car to use the bathroom. When the driver returned to the car, he said, "So you're trying to give me a broken phone." J.S. told the driver that the phone was not broken, it simply needed to be taken to the Apple store to be fixed. J.S. then heard the driver tell the front passenger to "get the strap," which J.S. understood to mean a gun. J.S. observed the front passenger reach down and pick up a gun. The front passenger then told J.S. to "give [him] everything." J.S. described the gun as a "yellow-goldish" assault rifle with a scope.

---

on February 12, 2019. At trial, J.S. did not provide his date of birth or his age at the time of the robbery.

Believing that the front passenger was going to shoot him, J.S. handed him his rose gold iPhone SE. The front passenger instructed J.S. to reset the iPhone so that it could not be tracked. When J.S. responded that he did not know how to reset it, the front passenger instructed the back passenger to reset the phone. The back passenger reset the phone and handed it to the driver. The driver then instructed J.S. to give him his hoodie and shoes, and J.S. complied. The driver told J.S. to get out of the car. He did. J.S. then heard the front passenger say, "Hurry up and run before I shoot you while you're running."

At trial, J.S. identified Mr. Bennett as the driver. J.S. also recognized the iPhone SE, identified as State's Exhibit 2, as the one that he had given to the front passenger. J.S. indicated that the serial number located on the back of the phone was the same number that he had obtained from the iPhone's box and provided to the police.

J.D., who was fifteen years-old at the time of trial, testified that he was seated in the back seat of the vehicle on February 12, 2019 when Mr. Bennett and Montez Alexander robbed J.S. According to J.D., Mr. Bennett, who is also known as "Trigger," was the driver and Mr. Alexander was the front passenger. J.D. identified Mr. Bennett at trial.

J.D. testified that Mr. Bennett and Mr. Alexander informed him that they were "pulling up to somebody's house to buy a phone or something." J.D. stated that J.S. got in the car and gave Mr. Bennett a cracked iPhone 4. Mr. Bennett told J.S. to give him his other phone, which was a rose gold iPhone, and either Mr. Bennett or Mr. Alexander pointed the "fake AR15" or "Airsoft gun" at J.S. J.D. stated that Mr. Bennett told J.S. to "take the iCloud" off the gold iPhone. Mr. Bennett also took J.S.'s hoodie before letting him out of the car.

3

State Trooper John Wildman, the primary investigator assigned to the case, testified that J.S. provided him with the ME ID serial number for the iPhone SE. Based on information discovered in the course of his investigation, Trooper Wildman secured an arrest warrant for Mr. Bennett, and located and arrested him. A search of the residence where Mr. Bennett was arrested revealed a backpack containing a rose gold iPhone SE with an ME ID number matching J.S.'s iPhone SE, as well as a silver and black vape pen and a black bandana.

Mr. Bennett was ultimately sentenced solely on charges related to the assault of J.S. and conspiracy as previously discussed.

## DISCUSSION

## I.

## The *Batson* Challenge

During jury selection, the State exercised a peremptory strike as to juror number thirteen. After the jury was selected, but before the jury was sworn, defense counsel raised a *Batson* challenge as to juror number thirteen, arguing the prosecutor had stricken the juror on the basis of race, as she was the only Black person in the venire.

> Your Honor, Juror No. 13 is the only African American juror, potential juror, in the entire pool. She did not raise any issues during her voir dire that would suggest that there is any particular reason to strike her from the jury other than her race…. And for that reason the jury is not acceptable to the defense.

Defense counsel also argued that "there were numerous members of the jury pool who indicated that they had been victims of some crime or another that was unsolved or that a defendant was acquitted or never charged." Specifically, defense counsel noted of the

jurors selected, juror number four had been the victim of a theft two weeks prior, for which no one had been arrested or charged, and juror number twenty-seven's in-laws had been the victims of an unsolved burglary. Juror number twenty-seven had recounted that the burglary occurred "ten-ish" years ago, and that the stolen property had been found at a pawn shop and that a man had been charged, though the juror could not recall if the case went to trial.

The prosecutor emphasized that his decision to strike juror number thirteen "had nothing to do with race," and "was solely because of the response she gave in response to voir dire questions." The prosecutor provided the following explanation for striking juror number thirteen:

> … Juror No. 13 indicated that her … mother had been the victim of a crime and she indicated that person had not been convicted and I was concerned that that lack of conviction and perhaps follow through from law enforcement would lead her to have some kind of either distrust in the prosecutor's office or in law enforcement.

The prosecutor further explained he had stricken juror number thirteen, "[s]olely related to that issue and nothing else."

The trial court denied the *Batson* challenge, finding that the prosecutor's explanation showed no discriminatory purpose:

> [Defense counsel] says [prospective juror number thirteen] was stricken improperly. [The prosecutor] indicates that she answered a question relating to crimes against her mother which were unsolved. [Defense counsel] indicates that in particular Juror No. 4 in reference to a crime that occurred two weeks ago, that was not solved. With regard to Juror No. 4, that was theft of a wallet while she was in a location. That was not the nature of the crime that I have described here. Based on what I have before me, I deny the Batson challenge. I find the evidence is insufficient and I find the suggestions or explanations given by the state's attorney are sufficient.

5

Defense counsel noted an objection to the jury as seated. The trial commenced. Mr. Bennett was ultimately tried, convicted, and sentenced.

Mr. Bennett argues the trial court's acceptance of the prosecutor's explanation for striking juror number thirteen violated *Batson* because the result (1) disparately impacted Black jurors, (2) ensured that no Blacks were seated on the jury that tried Mr. Bennett, who is Black, and because (3) the prosecutor inconsistently applied his stated policy for striking jurors who had been the victims of crime. The State responds that the trial court was not clearly erroneous in finding that the prosecution's reason for using a peremptory strike as to juror number thirteen was race-neutral and not pretextual.

## II.

### Standard of Review for a *Batson* Challenge

In Maryland, courts use the three-part analysis set forth in *Batson* to evaluate whether a peremptory strike was racially discriminatory. *Ray-Simmons v. State*, 446 Md. 429, 435 (2016) (citing *Batson*, 476 U.S. at 89). First, the party challenging the strike must "make a *prima facie* showing—produce some evidence—that the opposing party's peremptory challenge to a prospective juror was exercised on one or more of the constitutionally prohibited bases." *Id.* at 436 (citing *Purkett v. Elem*, 514 U.S. 765, 767 (1995) (per curiam)). The threshold for a prima facie showing, which is not as high as a prima facie case "is established if the opponent of the peremptory strike(s) can show 'that the totality of the relevant facts gives rise to an inference of discriminatory purpose.'" *Id.* (citing *Johnson v. California*, 545 U.S. 162, 168 (2005)). Nonetheless, the moving party

must "prove by a preponderance of the evidence that the peremptory challenges were exercised in a way that shifts the burden of production to the State and requires it to respond to the rebuttable presumption of purposeful discrimination that arises under certain circumstances." *Mejia v. State*, 328 Md. 522, 534 (1992).

Importantly, if the prosecution offers a "race-neutral explanation for the peremptory challenges and the trial court has ruled on the ultimate question of intentional discrimination, the preliminary issue of whether the defendant had made a prima facie showing becomes moot." *Hernandez v. New York*, 500 U.S. 352, 359 (1991) (noting that the trial court "had no occasion to rule that petitioner had or had not made a prima facie showing of intentional discrimination because the prosecutor defended their use of the strikes"); *Davis v. Balt. Gas & Elec. Co.*, 160 F.3d 1023, 1027 (1998) (finding that the issue of "whether the party disputing the peremptory strikes has established a prima facie case" is moot when the opposing party "offers a race-neutral explanation"). *Cf. United States Postal Serv. Bd of Governors v. Aikens*, 460 U.S. 711, 715 (1983) (analogizing that similar to prima facie showings under Title VII of the Civil Rights Act of 1964 "where the defendant has done everything that would be required of him if the plaintiff had properly made out a prima facie case, whether the plaintiff really did so is no longer relevant").

Second, if the objecting party "establishes a prima facie showing of discrimination [,]" then the striking party must provide "an explanation for the strike that is neutral as to race, gender, and ethnicity[,] but that reason need not be "persuasive or plausible." *Edmonds v. State*, 372 Md. 314, 331 (2002); *Ray-Simmons*, 446 Md. at 436 (citing *Purkett*, 514 U.S. at 767). Unless a discriminatory intent is inherent in the explanation, "[a]ny

7

reason offered will be deemed race-neutral." *Ray-Simmons*, 446 Md. at 436 (quoting *Edmonds v. State*, 372 Md. 314, 330 (2002)).

The third part of the analysis occurs once the striking party provides a race-neutral explanation. Now, the court must decide "whether the opponent of the strike has proved purposeful racial discrimination." *Purkett*, 514 U.S. at 767. "It is not until the third step that the persuasiveness of the justification becomes relevant—the step in which the trial court determines whether the opponent of the strike has carried his burden of proving purposeful discrimination." *Johnson*, 545 U.S. at 171 (quoting *Purkett*, 514 U.S. at 768) (emphasis omitted); *see also Edmonds*, 372 Md. at 330. At this step, "the trial court must evaluate not only whether the [striking party's] demeanor belies a discriminatory intent, but also whether the juror's demeanor can credibly be said to have exhibited the basis for the strike attributed to the juror by the [striking party]." *Snyder*, 552 U.S. at 477. *See also Flowers v. Mississippi*, 139 S. Ct. 2228, 2244 (2019) (quoting *Foster*, 136 S. Ct. at 1754) ("The third step requires the trial judge to decide 'whether the prosecutor's proffered reasons are the actual reasons, or whether the proffered reasons are pretextual and the prosecutor instead exercised peremptory strikes on the basis of race.'"). Whether there has been purposeful discrimination is an issue of the credibility of the race-neutral explanation, which is measured by several factors, including counsel's demeanor, the reasonableness or improbability of the explanations, and whether the explanation is attributable to an accepted trial strategy. *Miller-El v. Cockrell*, 537 U.S. 322, 339 (2003) (citing in part *Batson*, 476 U.S at 98).

A trial court's determination as to discriminatory intent is a factual finding that is "afforded great deference and will only be reversed if it is clearly erroneous." *Ray-Simmons*, 446 Md. at 437; *see also Khan v. State*, 213 Md. App. 554, 568 (2013) ("In reviewing a trial judge's *Batson* decision, appellate courts do not presume to second-guess the call by the 'umpire on the field' either by way of de novo fact finding or by way of independent constitutional judgment." (quoting *Bailey v. State*, 84 Md. App. 323 (1990)).

**III.**

**ANALYSIS**

The first step of the *Batson* analysis requires that the defendant "make a prima facie showing that the prosecutor has exercised peremptory challenges on the basis of race." *Batson*, 476 U.S. at 96-97; *see also Hernandez,* 500 U.S. at 358. Such a showing is manifest where the exercise of a peremptory challenge excludes the sole member of a racial or ethnic minority from the jury. That was the case in *Mejia*, where the defendant argued that the State purposefully struck the sole Hispanic person in the venire when the defendant was Hispanic and was charged "with raping a non-Hispanic or [W]hite woman." The Court of Appeals held there that "a prima facie showing of [the fact that the only Hispanic person was stricken]" and that "the record reveal[ed] that [all] but one person with a Hispanic background was in the venire and the State struck that person, it may be concluded that a prima facie case of purposeful discrimination has been proven." *Id.* at 540.

As in *Mejia* where the prosecution struck the only person of the jury who was the same ethnicity of the defendant, here, the prosecution also struck the only venire-person who was Black, Mr. Bennett is also Black, and the victim, J. S., is a White teenager.

9

Striking a potential juror leading to the exclusion of an entire group of people from the jury, as the prosecution did here, creates a prima facie showing of racial discrimination. *Id.* at 539; *accord Hall v. Martin*, 108 Md. App. 435, 449 (1996) ("[W]hen all of the members of a protected class are stricken and the objecting party asserts that it was done for improper discriminatory reasons, no further showing of discriminatory purpose need be made in order to establish a *prima facie* showing."); *Stanley v. State*, 313 Md. 50 (1988) (same).

As the Court of Appeals explained in *Ray-Simmons*, "whether the challenger has made a prima facie case under step one becomes moot if the striking party offers an explanation for the challenged strike." *Edmonds*, 372 Md. at 331 (citing *Hernandez*, 500 U.S. at 359) (holding that "whether petitioner has made a prima facie showing that the State's challenges were racially motivated ... is moot because the State offered explanations for its peremptory challenges and the court ruled, in part, on the ultimate question of intentional discrimination"); *Davis v. Balt. Gas & Elec. Co*., 160 F.3d 1023, 1027 (4th Cir. 1998) (holding that "whether the party disputing the peremptory strikes has established a prima facie case of discrimination is moot, since Defendant voluntarily offered racially neutral reasons for its strikes"). "The effect of a prima facie case of racial or gender discrimination is to shift the burden of production to the party exercising the strike to offer a race or gender-neutral explanation. Once a [race- or gender-neutral] explanation is offered, the prima facie case dissipates[.]" *Gilchrist v. State*, 340 Md. 606, 634 (1995).

Although a prima facie showing is established where an entire group of people has been struck, here, the State offered a race-neutral reason for the strike. Thus, even though

an entire group was excluded with the State's exercise of a single preemptory strike, the prima facie showing of discriminatory intent became moot once the prosecutor offered a race-neutral reason. *See Ray-Simmons*, 446 Md. at 437. But the inquiry does not end; the court moves on to Step Two.

Step two of the *Batson* analysis requires that the State put forward a "a clear and reasonably specific explanation of its reasons for exercising the challenge." *See Ray-Simmons*, 446 Md. at 444. Mr. Bennett does not dispute that the prosecutor provided a race-neutral explanation for striking juror number thirteen due to the prosecutor's concerns that juror number thirteen may be biased against law enforcement or the prosecution because of her mother's experience as the victim of a crime where the defendant was tried, but not convicted. *See Gilchrist v. State*, 340 Md. 606, 616 (1995) (noting that the trial court's determination that the defense's striking of two potential jurors because they or members of their family had been victims of a crime was a "satisfactory" reason for the strikes). After the State has offered a race-neutral explanation, the analysis moves to the third and final step.

As for step three of the *Batson* analysis, Mr. Bennett argues that the totality of the circumstances demonstrates that "the circuit court erred when it found that the prosecutor did not strike juror number thirteen because of her race." Specifically, Mr. Bennett contends that striking juror number thirteen resulted in a disparate impact on African Americans and ensured that no African Americans were seated on the jury. He also contends that the prosecutor's failure to consistently apply his stated policy to other venire members, undermined the validity of the prosecutor's race-neutral explanation.

11

The disparate impact of a peremptory strike on the composition of the jury is only one of the factors to be considered in analyzing whether the prosecutor's decision was purposefully discriminatory. *Edmonds*, 372 Md. at 330. *See also Stanley*, 313 Md. at 79 ("[T]he trial court should evaluate the proffered explanations in light of recognized standards, circumstances of the case, and the court's knowledge of trial tactics[.]"); *Hall*, 108 Md. App. at 456 (affirming denial of *Batson* challenge where the trial court credited a race-neutral explanation for a strike that excluded the only African-American venireperson). The Supreme Court has noted that while a prosecutor's policy might result in the disproportionate removal of prospective jurors of a particular race, "that disproportionate impact does not turn the prosecutor's actions into a *per se* violation of the Equal Protection Clause." *Hernandez v. New York*, 500 U.S. 352, 361 (1991). In *Hernandez*, the Supreme Court explained that:

> [D]isparate impact should be given appropriate weight in determining whether the prosecutor acted with a forbidden intent, but it will not be conclusive in the preliminary race-neutrality step of the Batson inquiry … Unless the government actor adopted a criterion with the intent of causing the impact asserted, that impact itself does not violate the principle of race neutrality.

*Id*. at 362.

As Mr. Bennett argues, courts also must consider consistency in determining whether the prosecutor had a discriminatory motive, namely "[w]hether similarly situated [W]hite jurors were struck on identical or comparable grounds." *Spencer v. State*, 450 Md. 530, 559 (2016) (quoting *Stanley*, 313 Md. at 79); *see also Miller-El v. Dretke*, 545 U.S. 231, 241 (2005) ("If a prosecutor's proffered reason for striking a [B]lack panelist applies

12

just as well to an otherwise-similar non-[B]lack who is permitted to serve, that is evidence tending to prove purposeful discrimination to be considered at *Batson's* third step."); *Flowers v. Mississippi*, 139 S. Ct 2228, 2249-50 (2019) (same); *Foster v. Chatman*, 136 S. Ct. 1737, 1742 (2016) (same); *McDaniels v. Kirkland*, 813 F.3d 770, 778 (9th Cir. 2015) ("[B]ecause we[, the appellate court,] are separated by time and distance from the proceedings," this comparative analysis of the application of reasoning applied to [B]lack versus [W]hite jurors "is often the best if not 'the only means we will have for assessing the state court's factfinding.'"); *Mejia*, 328 Md. at 540 ("If the government used its peremptory challenges to strike the last remaining juror of the defendant's race," it is sufficient to "'raise an inference' that the juror was excluded 'on account of his race.'" (quoting *U.S. v. Chalan*, 812 F. 2d 1302, 1314 (10th Cir. 1987)).

In *Snyder*, the Supreme Court emphasized that in considering a *Batson* objection, "all of the circumstances that bear upon the issue of racial animosity must be consulted." *Snyder*, 552 U.S. at 478. Specifically, the Court noted that the plausibility of an explanation for a strike must be evaluated in the context of the prosecutor's acceptance of White jurors who described similar concerns. *Id*. at 483. For example, in *Snyder*, the excluded African American juror had an obligation to fulfill his student-teacher hours. The prosecutor used that explanation to remove the juror. *Id*. at 482-83. But the State, however, kept two White jurors who had "substantially more pressing" obligations, which consisted of tending to a spouse who just had a hysterectomy and finishing the construction of homes. *Id*. at 484. The inclusion of White jurors with more pressing obligations weighed in support of a *Batson* violation. *Id*. *But see Spencer*, 450 Md. at 562 (noting that counsel validly

13

established and articulated the difference between the selected [W]hite jurors and the excluded [B]lack jurors, which supported the peremptory strike); *United States v. Savage*, 970 F.3d 217, 269 (noting that there were "significant differences" regarding the jurors, thus eliminating any possible comparison).

Here, the State claimed its rationale for excluding the sole Black juror was because of her perceived distrust (or general animus) toward law enforcement and the State's Attorney's Office because of a failed criminal prosecution twenty years ago affecting her mother, who was the victim. We believe that the State inconsistently applied its policy for exclusion and the trial court did not look beyond that explanation to the specific circumstances of the jurors in question. To us, the experiences that the potential jurors described were similar, and the prosecution failed to "validly establish, and articulate" any "significant differences" between the selected White jurors and the excluded Black juror. Although the Supreme Court has stated that "where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous[,]" *Hernandez*, 500 U.S at 369, we do not see two permissible views of the evidence. To support this conclusion, we look to our independent review of the record.

During voir dire, the court asked the following question:

> Has any member of the panel, any immediate family member or close personal friend ever been the victim of a robbery, armed robbery, assault or theft? If so, please stand.

14

The record reflects that twenty-one prospective jurors rose, indicating that they had an affirmative answer. Among them were jurors numbered four, thirteen, and twenty-seven.[4]

After stating that she was a victim of "a robbery," juror number four clarified that her "wallet was stolen out of [her] gym bag." She was then questioned as follows:

> THE COURT: Did the person approach you who took that item from you or did you locate that item had been taken from you once you were…
>
> [JUROR NUMBER FOUR]: I spoke to her before it happened, but we never talked afterwards or during the time.
>
> THE COURT: Okay. Did that happen recently?
>
> [JUROR NUMBER FOUR]: Two weeks ago, ma'am
>
> THE COURT: Are there charges pending?
>
> [JUROR NUMBER FOUR]: There are not.
>
> *   *   *
>
> THE COURT: Do you expect there will be some sort of court case as a result of this incident?
>
> [JUROR NUMBER FOUR]: I have not heard anything. I don't think there will be.
>
> *   *   *
>
> THE COURT: Because you have had an item taken from you, do you believe that you can sit and listen to testimony and evidence and be fair?
>
> [JUROR NUMBER FOUR]: Yes, ma'am.

---

[4] Even though these three people were members of the venire and were more accurately "prospective jurors," from this point on, we shall simply refer to them by the less cumbersome appellation of "juror number x."

15

THE COURT: Do you believe you can be impartial?

[JUROR NUMBER FOUR]: Yes, ma'am.

We point out that juror number four's testimony reveals that she was the victim of a theft and the incident happened only two weeks before the trial.

Next, after stating that her in-laws were the victims of "a robbery," juror number twenty-seven testified as follows:

THE COURT: Did [the crime] occur here in [this] county?

[JUROR TWENTY-SEVEN]: Yes, it did.

THE COURT: How long ago?

[JUROR TWENTY-SEVEN]: I can't quite remember. It's been years.

\* \* \*

THE COURT: Were there any persons charged?

[JUROR TWENTY-SEVEN]: Yes.

THE COURT: Did any persons go to trial?

[JUROR TWENTY-SEVEN]: I'm not sure.

\* \* \*

THE COURT: Were you involved in the case?

[JUROR TWENTY-SEVEN]: No.

THE COURT: Okay. So you weren't a witness or didn't go to court or anything?

[JUROR TWENTY-SEVEN]: No. Their house was broken into and nobody was there.

16

THE COURT: So, it was a burglary?

[JUROR TWENTY-SEVEN]: Yeah.

THE COURT: And so you're not really sure if somebody was charged or if the case went to trial?

[JUROR TWENTY-SEVEN]: I know that he was charged.

THE COURT: A person was charged?

[JUROR TWENTY-SEVEN]: Mm-hmm. I just … I think there were other crimes committed also on top of that.

THE COURT: Okay.

[JUROR TWENTY-SEVEN]: Because property was found at a pawn shop.

\*   \*   \*

THE COURT: Is there any reason why you can't sit and listen to testimony and evidence in this case and be fair and impartial?

[JUROR TWENTY-SEVEN]: I don't believe so.

THE COURT: Are you sure?

[JUROR TWENTY-SEVEN]: I'm positive.

THE COURT: Okay. Thank you. It's the way I asked the question.

\*   \*   \*

[DEFENSE COUNSEL]: How long ago was [the burglary]?

[JUROR TWENTY-SEVEN]: It's been years. Like ten-ish.

We take from juror twenty-seven's testimony that the victims were her in-laws, the

burglary occurred "ten-ish" years ago, and the juror, seemingly, was initially unsure about

17

whether she could be fair and impartial. At the same time, based on a review of the cold record, the judge also acknowledged that the question might have been confusing. Nonetheless, the juror seemed unsure, stating "I don't *believe* so" in response to whether she had any reason to be impartial. Nonetheless, on balance, we think the juror's seeming uncertainty is probably nothing more than the use of a colloquialism to express her ability to impartially assess the evidence.

Now, in comparison, we will look at juror number thirteen's testimony. After establishing it was her mother who was a victim of "a robbery," juror number thirteen testified:

> THE COURT: How long ago was that, ma'am?
>
> [JUROR THIRTEEN]: It was a long time ago.
>
> THE COURT: Long time?
>
> [JUROR THIRTEEN]: Yes. It was probably maybe, like, 20 years ago. Might have been a little longer. It was a while ago.
>
> THE COURT: Were you involved in your mother's case?
>
> [JUROR THIRTEEN]: No.
>
> THE COURT: Is there anything that would prevent you from sitting and listening to testimony in this case and being fair and impartial?
>
> [JUROR THIRTEEN]: No.
>
> [DEFENSE COUNSEL]: Were you living at home with her at that time?
>
> [JUROR THIRTEEN]: No.
>
> [DEFENSE COUNSEL]: Was there a weapon involved.

18

[JUROR THIRTEEN]: No.

[DEFENSE COUNSEL]: Was she injured?

[JUROR THIRTEEN]: No. They just robbed her.

[DEFENSE COUNSEL]: Did the case ever go to trial?

[JUROR THIRTEEN]: Yes.

[DEFENSE COUNSEL]: Was someone convicted in that case?

[JUROR THIRTEEN]: No. It wasn't enough evidence.

When analyzing juror number thirteen's answers and comparing them to both juror number twenty-seven's and juror number four's answers, we do not see the significance in the differences that the trial court determined were sufficient to exclude juror number thirteen but not the other two jurors. All three jurors were asked a similar line of questions, and all of them had connections to what they each, at least initially, called a "robbery."

With regard to when the crimes occurred, juror number four testified that she was the victim of a theft only two weeks prior to the proceedings. And, juror number twenty-seven said the crime in her case was "around ten-ish" years before the proceedings. However, juror number thirteen, the only Black juror of the three in question, was the only juror excluded despite stating that her experience occurred twenty years prior to the proceedings.

When weighing which juror may have had a more negative outlook of the police or prosecution, it appears to us that juror number thirteen would be the least likely to have a negative outlook. For example, juror number four was the victim of the crime herself, as opposed to juror number thirteen who merely had a family member who was a victim.

19

Additionally, juror number four stated that she "had not heard anything" from the authorities and that it was unlikely that the case was going to be prosecuted. Given that juror number four's case was unlikely to be prosecuted and that she had "had not heard anything" regarding the crime, juror number four was more likely to exhibit a negative outlook on the police or prosecution because her crime was more likely to remain unsolved whereas the case involving juror number thirteen's mother was solved, even though the defendant was not ultimately convicted.

Interestingly, no one clarified if the "robbery" that juror number thirteen mentioned was actually a robbery in the legal sense of the word, or a burglary, or a theft. We think it telling that jurors numbers four and twenty-seven both colloquially called what was either a theft or a burglary, "a robbery." It is just as likely that juror thirteen did the same. Both White jurors were asked or volunteered information that clarified which type of crime actually occurred. Juror thirteen did not volunteer additional information, nor was she asked to clarify what happened to her mother. Regardless, the salient facts for juror number thirteen are that the crime was one in which her mother was the victim, who, like the other victims, had something taken from her without a weapon, and the outcome was unfavorable or unknown. Juror number thirteen's experience was, thus, in several ways similar to that of juror number four but occurred much further back in time—approximately double the amount of time as juror number twenty-seven and 520 times the amount as juror number four.

The State's explanation for excluding juror number thirteen due to "lack of [a] conviction and perhaps follow through from law enforcement would lead her to have some

20

kind of either distrust in the prosecutor's office or in law enforcement," rings hollow. That rationale would lean far more in favor of excluding juror number four rather than thirteen, because (1) the crime directly involved juror number four, (2) occurred only two weeks prior to the trial, and (3) juror four expressed the sense that the police had not apprehended anyone and (4) were unlikely to do so. Because we cannot discern significant differences in the jurors' overall experiences, we do not think the State proffered a valid, race-neutral reason to inconsistently apply its policy between jurors number four and thirteen.

Additionally, when comparing the jurors' experiences with the offense which was about to be tried, armed robbery, the trial court judge stated that juror number four's experience, "was not the nature of the crime that I have described [in this case]." This is a less than tenable basis to have excluded juror number thirteen because jurors four and twenty-seven were also involved in theft-related crimes in which no weapon was used.[5] That experience was not vastly dissimilar to juror number thirteen's experience where her mother was "robbed," and no weapon was used either. If the comparison to the case at hand mattered, the jurors should have been examined under the same light.

We note, as did the trial court, that compared to juror number four, whose perpetrator is unlikely to face prosecution for the crime, juror number thirteen was aware that her mother's case was tried, although there was no conviction. We do not believe this difference to be significant and certainly not substantial enough to outweigh the other

---

[5] Recall that in the voir dire question, the court specifically asked if any the members of the venire panel, a family member, or a close personal friend had been "the victim of a robbery, armed robbery, assault, or theft?"

factors previously articulated, even under the deferential clear error standard. In the end, none of the perpetrators of the crimes at issue with these three jurors had been convicted as of the time of trial.

Because we see no significant differences in the jurors' experiences, we do not think the State proffered a valid, race-neutral reason to inconsistently apply its policy to this jury selection. Pointedly, regarding juror number thirteen, when comparing when the crimes occurred and the juror's responses to remaining impartial, we do not believe the prosecution proffered an explanation to show that "the juror's demeanor can credibly be said to have exhibited the basis for the strike attributed to the juror by the [striking party].'" *Ray-Simmons*, 446 Md. at 437. As we read the transcript, the State offered nothing aside from a flat assertion to support its conclusion that juror number thirteen would be more likely to distrust the criminal justice system because the perpetrator in juror thirteen's mother's case did not result in a guilty verdict approximately *twenty years ago*. Indeed, when asked if "there [was] anything that would prevent [her] from … being fair and impartial," she simply said, "no." In contrast, when asked if she would have an issue remaining fair and impartial, juror number twenty-seven responded "I don't believe so," requiring the trial court to restate the question. We fully understand that juror number twenty-seven's initial answer could merely be a matter of semantics, but it nonetheless underscores that juror number thirteen was confident that she would be able to serve on the jury impartially no differently than juror numbers four and twenty-seven.

In summary, we conclude the trial court erred when it permitted the exclusion of the sole Black juror in the venire based on the State's inconsistent rationale. The State's reason

22

for excluding the Black juror was: Because the juror's mother was the victim in an unsuccessful robbery prosecution twenty years ago, the Black juror would not be fair to the State. That same rationale, if fairly applied, would have also disqualified two White jurors who were seated. The removal of the only Black juror ensured that an all-White jury would try a Black defendant.

We are well-attuned to the fact we are reviewing the events that happened at trial from a temporal and spatial distance. We understand the deference afforded to the trial court in this instance. But deference is not absolute. We stress that in evaluating a *Batson* challenge, the trial court should examine not only the credibility of the striking attorney, but also the credibility of the attorney's proffered, racially neutral reason; *see Miller-El*, 537 U.S. at 339; *McDaniels*, 813 F.3d at 778 ("A comparative analysis of the application of reasoning applied to [B]lack versus [W]hite jurors is often the best if not 'the only means we will have for assessing the state court's factfinding.'"). Here, a credible, racially neutral rationale is lacking. We therefore reverse the decision of the trial court on this issue.

## IV.

### Demand for Particulars

Mr. Bennett next argues that the trial court "committed reversible error when it refused to compel the State to respond to defense counsel's demand for a bill of particulars." Mr. Bennett filed a demand for a bill of particulars on March 25, 2019. On April 16, 2019, the State filed an opposition to Mr. Bennett's demand, and the following day, Mr. Bennett filed a motion to compel the State to provide a bill of particulars.

23

At the pre-trial hearing on June 28, 2019, defense counsel informed the court: "We are here for a motions hearing this afternoon. At this time I have not identified any issues for mandatory motions, so I would be withdrawing motions without prejudice."  The court proceeded to schedule a subsequent hearing on Mr. Bennett's motion for an order to serve a subpoena for tangible evidence and motion to compel evidence. Mr. Bennett's outstanding motion to compel the State to provide a bill of particulars was not addressed. At the subsequent pre-trial hearing on July 15, 2019, Mr. Bennett's demand for a bill of particulars and motion to compel were not addressed.

On July 29, 2019, the parties appeared before the court for a third pre-trial hearing. Defense counsel raised Mr. Bennett's outstanding demand for a bill of particulars and motion to compel for the first time:

> [DEFENSE COUNSEL]: I believe there is still one open issue pending trial, Your Honor. And that is that the defense filed a demand for a bill of particulars timely, and the State, not timely, filed a response refusing to supply a bill of particulars. And the defense timely filed a motion to compel the State to supply a bill of particulars. And that was on April 17th, Your Honor. And this motion has not been ruled on.

> [PROSECUTOR]: Your Honor, on June 28th my notes reflect that the defense waived all motions except those motions involving the motion to compel which the Court just resolved today.

> [DEFENSE COUNSEL]: Your Honor, my understanding was that I was waiving the mandatory motions regarding suppression issues, severance and the like.

> Your Honor, I concede that this motion slid off my radar until I began trial preparation, but Your Honor, I am statutorily entitled to bills of particulars in the counts relating to assaults and theft. There is nothing I need to do under the statute other than timely file the request, which was done. …

*     *     *

24

THE COURT: I note in connection with this matter we did appear on June 28th . The motion was not addressed at that time. I'm not going to address it today. I find it's moot. It wasn't requested at the motions hearing. …

In this case, Mr. Bennett waived his right to a ruling on the motion to compel by repeatedly failing to bring the motion to the attention of the trial judge. Waiver of a claim "'extinguishes the waiving party's ability to raise any claim of error based upon that right.'" *Brice v. State*, 225 Md. App. 666, 679 (2015) (quoting *Brockington v. Grimstead*, 176 Md. App. 327, 355 (2007), *aff'd*, 417 Md. 332 (2010)). "'[A] party who validly waives a right may not complain on appeal that the court erred in denying him the right he waived[.]'" *Id*.

Though Mr. Bennett submitted a timely demand for a bill of particulars, his counsel informed the court at the first motions hearing that Mr. Bennett was "withdrawing motions without prejudice." Even if, as Mr. Bennett contends, he intended only to withdraw mandatory motions, he nonetheless waived his right to a ruling on the motion to compel by failing to request a ruling on the motion at either the first or second pre-trial motions hearing. *See White v. State*, 23 Md. App. 151, 156 (1974) ("The motion to be decided must be brought to the attention of the trial court. Appellant may not take advantage of an obscurely situate, undecided motion and stand mute in the face of repeated requests by the judge for all pending motions to be decided."). *See also Owens v. State*, 399 Md. 388, 419 (2007) ("Generally, 'most rights, whether constitutional statutory or common-law, may be waived by inaction[.]'") (quoting *State v. Rose*, 345 Md. 238, 248 (1997)). Accordingly,

Mr. Bennett's contention that the circuit court erred by refusing to require the State to provide a bill of particulars was waived and is not properly before us.[6]

> **JUDGMENTS OF THE CIRCUIT COURT FOR CECIL COUNTY REVERSED. THE CASE IS REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. CECIL COUNTY TO PAY THE COSTS.**

---

[6] We note that where, as here, the demand for a bill of particulars was waived, the issue is not reviewable on appeal for plain error. *See State v. Rich*, 415 Md. 567, 580 (2012) (distinguishing between forfeited rights, which are reviewable for plain error, and waived rights, which cannot be reviewed on appeal).